UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION
-------------------------------------------------------------------X

MARLENE STOLLINGS,

                  Plaintiff,

    -against-

TEXAS TECH UNIVERSITY and KIRBY HOCUTT,

                 Defendants.
-------------------------------------------------------------------X

Civil Action No. 5:20-cv-250

**COMPLAINT**

**Jury Trial Demanded**

By her attorneys Michelman & Robinson, LLP, Plaintiff Marlene Stollings brings her Complaint against Defendants Texas Tech University and Kirby Hocutt, and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract, fraud, fraudulent inducement, defamation and sex discrimination in violation of the right to equal protection under the United States Constitution and in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*[1]

2.      Plaintiff Marlene Stollings ("Coach Stollings") is the former Head Coach of the Texas Tech Lady Raiders ("Lady Raiders"), which represents Texas Tech University ("Texas Tech") in the Big 12 Conference for NCAA Division I (D-I) women's basketball.

3.      In 2018, Coach Stollings entered into an employment agreement with Texas Tech to serve as the Head Women's Basketball Coach from April 11, 2018 to March 31, 2024.

---

[1] Coach Stollings is in the process of filing a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and, upon receipt of a Right to Sue letter, will seek leave to amend this Complaint to add counts for sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.

4.      Coach Stollings was chosen specifically to revitalize the Lady Raiders, which was one of the worst-performing and dysfunctional programs in the country.

5.      Upon arrival, Coach Stollings worked tirelessly to improve the academic and athletic performance of her student-athletes.

6.      Although expectations were set high, Coach Stollings methods were fair and reasonable, and Coach Stollings provided a balanced approach designed to bring out the best in the Lady Raiders.

7.      As the head of the Lady Raider's, Coach Stollings advocated on behalf of her players for equitable funding and resources.  Texas Tech ignored these requests.

8.      Despite the lack of resources, Coach Stollings methods worked.  Following several years of losing seasons and low academic performance, the Lady Raiders began to achieve greater success both on and off the court.

9.      However, given the increased expectations, some of the student-athletes decided to transfer to less-demanding or less-competitive programs.

10.      In order to secure a transfer and continue playing without interruption, NCAA rules require that student-athletes must claim that the transfer is based on a desire to avoid a negative atmosphere or for physical and mental health reasons.

11.      As a result, some of the departing student-athletes provided negative feedback about their experiences with the Lady Raiders.

12.      In partial response to complaints on the NCAA transfer portal from transferring student-athletes, Texas Tech ultimately conducted two internal reviews of the Lady Raiders and the women's basketball program.

2

13.     The internal reviews, which involved multiple members of the Athletics Department and extensive interviews with student-athletes, staff and coaches, determined that Coach Stollings had not acted inappropriately or abusively and that any complaints to the contrary were unfounded.

14.     Shortly after the conclusion of the second internal review, a USA Today reporter began working on an article about the Lady Raiders, which focused on interviews with former student-athletes.

15.     The USA Today article was published on August 5, 2020, and included multiple unsubstantiated claims and factual misrepresentations regarding the Lady Raiders and Coach Stollings, almost entirely from transferring student athletes and largely echoing the explanations that transferring team members used to try to obtain immediate eligibility at another institution.

16.     Prior to and following the publication of the USA Today article, Texas Tech Athletic Director Kirby Hocutt ("Mr. Hocutt") personally assured Coach Stollings that she had the full support of Texas Tech, emphasizing and reiterating that the internal investigations had already thoroughly examined the same complaints and issues and concluded that the complaints were without basis or justification.

17.     However, due to negative publicity following the USA Today article, Mr. Hocutt became afraid that his own position was at risk and began looking to deflect blame.

18.     On August 6, 2020, Texas Tech terminated Coach Stollings' employment contract, purportedly for cause, upon information and belief at Mr. Hocutt's request.

19.     This termination could not properly have been for cause.  Texas Tech's own internal reviews had found—accurately—that Coach Stollings had not taken any actions which were in violation of her employment contract.

20.     Moreover, Texas Tech's decision to terminate Coach Stollings was based on discriminatory biases against female coaches.  Texas Tech and Mr. Hocutt regularly, and in this instance in particular, penalized female coaches for employing the same demanding and effective coaching techniques that male coaches utilize and utilized without consequence.

21.     In fact, Texas Tech has regularly hired and continues to employ male coaches who engage in confirmed, more-extreme practices and procedures than any methods Coach Stollings ever used.

22.     Further, the decision to terminate Coach Stollings is but a part of Texas Tech's and Mr. Kirby's mistreatment of members of the gay and lesbian community.

23.     Coach Stollings is one of four members of that community who have been victimized in 2020 alone by Defendants' discriminatory treatment of community members employed by the Texas Tech Athletic Department.

24.     It also is not coincidental that Texas Tech and Mr. Hocutt's Athletics Department were able to save over a quarter million dollars per year in salary for Coach Stollings' replacement and the new staff hirings.

25.     Following her termination, Mr. Hocutt made knowingly false and malicious defamatory public statements concerning Coach Stollings as a person and as a coach.

26.     Texas Tech and Mr. Hocutt have grievously harmed Coach Stollings career and damaged Coach Stollings ability to secure future coaching positions, in addition to causing her severe emotional injury.

## **PARTIES**

27.     Plaintiff Marlene Stollings is an individual Texas resident residing in Lubbock, Texas.

28.     Defendant Texas Tech University is a public university located in Lubbock County, Texas, which seeks and receives federal financial assistance for its education and athletic programs and activities.

29.     Defendant Kirby Hocutt is an individual who is employed by Defendant Texas Tech University as its Athletic Director and, upon information and belief, is a Texas resident residing in Lubbock County.   Defendant Kirby Hocutt is sued in his official and individual capacities.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a)(3)-(4), as this matter arises under the Constitution and laws of the United States. This Court has supplemental jurisdiction over the state and common law claims herein alleged under 28 U.S.C. § 1367(a), as they arise out of a common nucleus of operative facts as the federal law claims.

31.     Venue and jurisdiction are proper in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial number of the events, acts or omissions giving rise to Plaintiff Marlene Stollings' claims occurred within the boundaries of this judicial district.

## FACTUAL BACKGROUND

**I.     Coach Stollings Had A Successful Career As A Women's Basketball Coach Prior To Texas Tech**

32.     As a star basketball player, Coach Stollings achieved recognition in high school and at Ohio University, before playing professionally in the National Women's Basketball League ("NWBL") and in Europe.

33.     In 2000, Coach Stollings began her college coaching career as an assistant coach with the women's basketball program at Jacksonville University.

34.     Over the next decade, Coach Stollings served in various coaching positions with several women's collegiate basketball programs.

35.     In 2011, Coach Stollings became the head women's basketball coach at Winthrop University ("Winthrop") and achieved an 18-13 record in her first season.

36.     This was a remarkable achievement, as Winthrop only had one prior winning season in the past 26 years.

37.     In recognition of her success, Coach Stollings was awarded the 2012 Big South Conference Coach of the Year in women's basketball.

38.     In 2012, Coach Stollings became the head women's basketball coach at Virginia Commonwealth University ("VCU").

39.     By 2013, under Coach Stollings' guidance, VCU's basketball program had greatly improved, resulting in a trip to the 2014 Women's National Invitation Tournament.  VCU's 22 wins in Coach Stollings' second year were the third most wins in school history and ranked in the nation's top five turnarounds.

40.     In 2014, Coach Stollings became the head women's basketball coach at the University of Minnesota ("Minnesota").

41.     Coach Stollings' efforts resulted in immediate success.  For the first time since 2009, Minnesota went to the 2015 NCAA Division I Women's Basketball Tournament.  In 2018, Minnesota made it to the second round of the NCAA Division I Women's Basketball Tournament, culminating in Minnesota's best season in 13 years.  Coach Stollings coached five Women's

National Basketball Association draft picks, two Players of the Year and one Freshman of the Year while at Minnesota.

## II.   Athletic Director Kirby Hocutt Is Responsible For Texas Tech's Athletic Programs

42.   In 2011, Mr. Hocutt left the University of Miami, Florida to become the Director of Athletics at Texas Tech.  Mr. Hocutt held that same position during most, if not all, of the time period when University of Miami athletics, primarily football and basketball, were corrupted by improper benefits boosters gave to student athletes from 2002 to 2010.  The University of Miami, several coaches and a dozen players were sanctioned and disciplined for this conduct, but somehow Mr. Hocutt, who was responsible for the corrupted program, avoided punishment.

43.   While serving as the Ohio University Athletic Director, Mr. Hocutt announced in January 2007 the elimination of four varsity sports, including the women's lacrosse team.  Mr. Hocutt gave no advance notice to the student athletes on those eliminated teams, compromising their ability to play intercollegiate athletics or engage in the activities that Ohio University and Mr. Hocutt had promised would be available when the student athletes committed to matriculating at Ohio University.  At Mr. Hocutt's direction, Ohio University transferred the money saved from funding those programs to teams that were generating revenue for Ohio University, and especially to the men's football and basketball programs.

44.   As the Athletic Director, Mr. Hocutt is responsible for supervising all collegiate sports at Texas Tech.

45.   As part of his duties, Mr. Hocutt is responsible for assuring the integrity of the entire athletic program and for recruiting, vetting and hiring head coaches and staff for Texas Tech's athletic program.

46.     Texas Tech has overlooked and covered up abuses under Mr. Hocutt's regime, including multiple disciplinary and criminal issues arising within the Texas Tech men's basketball and football programs and involving the conduct of certain male coaches of Texas Tech teams.  As long as the men's sports teams performed well and Texas Tech reaped the financial rewards, Texas Tech and Mr. Hocutt were willing to ignore and otherwise cover-up such activities.  And, indeed, under Mr. Hocutt's supervision of the athletic program, in 2019 alone Texas Tech's teams obtained a National Title in men's track, a National Title Game in men's basketball and a College World Series appearance.

47.     One example of Mr. Hocutt's role in covering up abuses in the men's athletic program, and Texas Tech's complicity, occurred in March 2011, after Mr. Hocutt drove the hiring of Billy Gillespie ("Coach Gillespie") as the head coach for the men's basketball team.

48.     In 2012, after just one year on the job, Mr. Hocutt allowed Coach Gillespie to resign ostensibly for "health reasons."  In fact, upon information and belief, numerous players had complained to Mr. Hocutt about accusations of mistreatment throughout the year.  Mr. Hocutt and Texas Tech covered up the mistreatment and, instead, allowed Coach Gillespie to avoid being terminated for cause, which would have resulted in public dissemination of the abuse in the men's basketball program.

III.     **The Lady Raiders**

49.     The Lady Raiders have a proud history.  Coach Marsha Sharp ("Coach Sharp") coached the Lady Raiders to regular conference championships and deep runs in the NCAA Division I Women's Basketball Tournament as head coach from 1982 to 2006.  In 1993, Coach Sharp won the NCAA Championship.

50.     Following the 2005-2006 season, Coach Sharp retired from coaching, after which the Lady Raiders began a steady decline.

51.     From 2006 to 2012, the Lady Raiders only made it to the NCAA Division I Women's Basketball Tournament twice, and never past the first round.

52.     For college athletic programs, success is often dependent on capable coaches who can recruit talented student-athletes to their programs, as well as bring out the best performances from their players.

53.     Therefore, successful coaches often develop self-perpetuating cycles, as winning programs naturally attract the most talented and driven student-athletes.

54.     Underperforming college athletic programs, on the other hand, often create dysfunctional cycles, as losing teams and unproven coaches have difficulty recruiting and retaining top-tier student athletes.

55.     As a result, underperforming college athletic programs often continue to underperform absent a coach capable of both recruiting more talented student-athletes and obtaining better performances from the current student-athletes.

56.     In 2013, Mr. Hocutt hired Candi Whitaker ("Coach Whitaker") as the Lady Raider's coach.

57.     Over four seasons, Coach Whitaker did not finish a single season with a winning record and did not once make it to the NCAA Division I Women's Basketball Tournament or the Women's National Invitation Tournament.  Coach Whitaker was fired midway through her fifth season, on January 1, 2018.

58.     By 2018, Mr. Hocutt was facing severe criticism due to his mismanagement of the Lady Raiders and Texas Tech's football team, among other programs.

59.     Mr. Hocutt desperately needed a coach who was capable of rapidly revitalizing the Lady Raiders.

60.     This task was especially difficult because, after consecutive losing seasons and no playoff appearances, the Lady Raiders were struggling with recruiting in addition to subpar on-court performance.

**IV.     Texas Tech Hires Coach Stollings**

61.     In 2018, Texas Tech approached Coach Stollings about taking over the Lady Raiders.

62.     Given Coach Stollings' record of turning around underperforming programs at Winthrop, VCU and Minnesota, Texas Tech was eager for Coach Stollings to achieve similar results with the Lady Raiders.

63.     On April 9, 2018, Coach Stollings entered into an employment contract with Texas Tech (the "Agreement").

64.     Both explicitly and implicitly, Mr. Hocutt and other Texas Tech officials and representatives represented and otherwise promised that Texas Tech recognized the sanctity of contracts and would abide by the Agreement's terms, conditions and obligations.  Mr. Hocutt,  like the other Texas Tech officials and representative involved in the recruiting of Coach Stollings and the negotiation of Coach Stollings' Agreement, never suggested that Texas Tech would under any circumstances hide behind the doctrine of sovereign immunity or any other shield and seek to avoid and abrogate Texas Tech's contractual obligations.

65.     Under Section I of the Agreement, Texas Tech agreed to employ Coach Stollings as the Head Women's Basketball Coach from April 11, 2018 to March 31, 2024.

66.     Under Section III(A) of the Agreement, Texas Tech agreed to compensate Coach Stollings by paying and otherwise guaranteeing an annual salary and other compensation until at least March 31, 2024, with the possibility of an extension to March 31, 2025, if the Lady Raiders were selected and participated in the NCAA Women's Basketball Tournament at least twice.

67.     Under Section III(A), Stollings was guaranteed an annual base salary of $300,000, running from April 1 to March 31 of each year.

68.     Under Section III(C)(4) and (5), Coach Stollings was entitled to fees up to $500,000 for Coach Stollings' "Outside Athletics Related Income (Rights Fees)" and "Supplemental Compensation," ranging from $10,000 for the student-athletes on her team maintaining a Team GPA over 2.65, to $100,000 for a National Championship Game win.

69.     Under Section V(A) of the Agreement, Texas Tech could terminate the Agreement for cause only if, "based on substantial evidence," Coach Stollings failed to perform her duties or acted in harmful or inappropriate ways, such as a "failure or refusal to perform assigned duties" or "serious violation of local, state, or federal laws."

70.     Additionally, Coach Stollings could also be terminated for cause under Section V(A) for engaging in "Objectionable Behavior," which was defined in Section IV of the Agreement as:

> behavior, actions or activities that (i) subject either Coach or University to substantial ridicule or embarrassment; (ii) substantially adversely affects Coach's or University's reputation; (iii) substantially interferes with or substantially diminishes Coach's standing as a University ambassador and representative; or (iv) are substantially contrary to the best interests of the University, its students, or its athletic program.

71.     Under Section V(A) of the Agreement, Texas Tech was required to give Coach Stollings "written notice and an opportunity to cure prior to termination pursuant to [Section V(A)], provided that such cause can be cured as determined by the University's President."

72.     If the Agreement were terminated for cause, Texas Tech's "sole obligation" to Coach Stollings would "be to pay her Base Salary until the effective date of termination in addition to any Rights Fees and Supplemental Compensation earned as of the date of termination."

73.     Under Section V(C) of the Agreement, in the event Texas Tech terminated Coach Stollings without cause, Texas Tech would be required to "pay liquidated damages to Coach [Stollings] in an amount equal to Seventy-Five Percent (75%) of the remaining Base Salary and Rights Fees."

**V.     Coach Stollings Faced Discriminatory Treatment From The Start**

74.     From the moment Texas Tech hired her, Coach Stollings faced discriminatory treatment.

75.     For example, Texas Tech deprived Coach Stollings and the Lady Raiders of resources and benefits that were given to the men's basketball team.

76.     Under Title IX of the Education Amendments Act of 1972 ("Title IX") and its implementing regulations, it is unlawful to discriminate on the basis of sex in education programs receiving Federal financial assistance.

77.     Athletics are considered an integral part of an institution's education programs and are covered under Title IX.

78.     To comply with Title IX's prohibition against discrimination on the basis of sex in athletics, a recipient that "operates or sponsors interscholastic, intercollegiate, club, or intramural

athletics" must "provide equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c).

79.     Whether equal athletic opportunities are available to both sexes depends on an evaluation of the institution's relative treatment of teams of different sexes in different program areas, including the provision of equipment and supplies; scheduling of games and practice times; travel and per diem allowance; opportunities to receive coaching and academic tutoring; assignment and compensation of coaches and tutors; provision of locker rooms, practice and competitive facilities; provision of medical and training facilities and services; provision of housing and dining facilities and services; and publicity.  34 C.F.R. § 106.41(c)(1)-(10).

80.     Defendants failed to provide Coach Stollings and the Lady Raiders with benefits and resources equivalent to men's sports teams such as the men's basketball team.

81.     Texas Tech is required to publish an annual report pursuant to the Equity in Athletics Disclosure Act.  These reports can be used to measure the discrepancies in funding between male and female teams.

82.     In the 2019 Report, Texas Tech reported that the men's basketball team had total operating expenses of $3,727,213, or $266,230 per participant.

83.     In comparison, for 2019, the Lady Raiders had total operating expenses of $1,202,203, or $92,477 per participant.

84.     "Operating expenses" are defined in the 2019 Report as "all expenses an institution incurs attributable to home, away, and neutral-site intercollegiate athletic contests (commonly known as "game-day expenses"), for (A) Lodging, meals, transportation, uniforms, and equipment for coaches, team members, support staff (including, but not limited to team managers and trainers), and others; and (B) Officials."

85.     Additionally, in the 2019 Report, Texas Tech reported that the men's basketball team had total expenses of $9,020,201.

86.     In comparison, for 2019, the Lady Raiders had total expenses of $4,983,413.

87.     "Total expenses" are defined in the 2019 Report as including "appearance guarantees and options, athletically related student aid, contract services, equipment, fundraising activities, operating expenses, promotional activities, recruiting expenses, salaries and benefits, supplies, travel, and any other expenses attributable to intercollegiate athletic activities."

88.     There is no substantive difference between the requirements for the men's basketball team and the Lady Raiders.

89.     There is no non-discriminatory explanation for why the men's basketball team received nearly three times the amount of funding the Lady Raider's received.

## VI.     Texas Tech Reviews The Women's Basketball Program

90.     Upon arrival, Coach Stollings dedicated herself to the Lady Raiders. The Lady Raiders began to show immediate progress.

91.     Following the previous 54-82 record over a five-year period, the Lady Raiders achieved a winning record under Coach Stollings and qualified for post-season play for the first time in seven years.

92.     Not only were the Lady Raiders succeeding on the court, but off the court as well. Under Coach Stollings' guidance, the Lady Raiders, which had previously been one of the lowest academically performing teams, achieved the highest cumulative GPA at Texas Tech.

93.     As Coach Stollings and Texas Tech officials, including Mr. Hocutt, had discussed at the beginning of Coach Stollings tenure, it was expected that as Coach Stollings increased

expectations and recruited higher-caliber student-athletes, some current student-athletes would transfer chiefly to less-demanding, less-competitive programs.

94.     In late summer 2019, Coach Stollings learned that certain departing student-athletes had provided negative feedback concerning their experiences at Texas Tech.

95.     These comments were expected and commonplace among NCAA transferring student athletes.  The NCAA transfer portal requires transferring student-athletes to file transfer applications.

96.     An applicant seeking to obtain immediate eligibility to play for another institution must convince the NCAA that she or he is transferring in order to avoid a negative atmosphere or to safeguard her or his physical or mental health.

97.     In short, a transferring student-athlete essentially is forced to provide negative feedback in order to receive NCAA approval to play immediately for another institution.

98.     One of the subjects of the negative comments involved a physical monitoring system that Coach Stollings has used for years to measure, for example, heart rates and pulse during practice to evaluate effort and conditioning.  Some of the student-athletes complained that they felt intimidated by the use of the monitoring.

99.     In fact, student-athletes generally welcome the system and the fact that objective, rather than subjective, analytics are used to determine whether, for example, greater effort is possible and whether the players are being over or under worked.

100.    The men's basketball coaching staff historically has used and uses a similar monitoring system without scrutiny.

101.    Other transferring student-athletes complained about being pushed too hard at practice.

102.    In fact, Coach Stollings made every Lady Raiders practice open to the general public, administrators and members of the Texas Tech community and not a single complaint or concern was ever raised about the student-athletes being pushed too hard or about any other inappropriate conduct or language.

103.    In contrast, the men's basketball practices are closed to the public, in part to assure that the coaches are not restrained in how they conduct practices or the language they use.

104.    After reviewing the transfer applications, Texas Tech delegated Sandy Collins, the Associate Athletic Director, and Greg Glaus, the Senior Associate Athletic Director, to conduct an internal review to evaluate the negative feedback.  The internal review lasted from December 9 to December 16, 2019.  (The "First Internal Review.")

105.    The First Internal Review committee examined four areas: (1) "Fear of retaliation for seeking mental health counseling or medical care"; (2) "Excessive force in drills by Niki Dawkins"; (3) "Public humiliation about body and weight"; and (4) "Egregious behavior that is detrimental to the student-athlete well-being."

106.    The investigative committee conducting the First Internal Review interviewed multiple coaches, administrators and other individuals involved with the Lady Raiders, and also reviewed all waiver documentation and Real Recruit feedback.

107.    After the exhaustive investigation, the investigative committee concluded that "[n]othing … lead to this conclusion" that egregious or detrimental behavior had occurred.

108.    The investigative committee noted that Coach Stollings was fully cooperative and forthcoming.

109.    The Report generated by the First Internal Review also noted:

a. "[Coach Stollings] feels there is some distance between the coaching staff and our mental health staff that prohibits them from working more in sync. She and her staff that we met with all feel that they are conveying the importance and being a proponent of mental health and this is nothing new to athletic programs."

b. "[Coach Stollings] feels if she were given more information about student-athletes seeking help, essentially information pertaining to performance she could help the S/A get where they need to be."

c. "[Coach Stollings] contributed that all practices are videotaped and held for 5 years should they need to be reviewed at any time."

110.   The First Internal Review also found that while there "is miscommunication or misunderstanding with the coaching staff and the sports psychology department…[a] common theme from those interviewed is that the culture of this program has changed since last season for the better.  Specifically, comments from student-athletes on mental health. and to [Texas Tech] auxiliary staff seem to be a lot better from 2018-19."

111.   The First Internal Review concluded by finding that: "[T]here does not seem to be any consistent information that would indicate that student-athletes left the program for reasons other than having different goals than those of the (new) coaching staff."

112.   A Title IX complaint filed against Ralph Petrella, Texas Tech's now former strength and conditioning coach, triggered a second internal review.  ("The Second Internal Review.")

113.   The Second Internal Review was conducted during the spring and summer of 2020.

114.   The strength and conditioning coach reports directly to Tory Stephens and does not report to the head women's basketball coach.   The former Senior Associate Athletics

Director/Senior Woman Administrator for the Department of Intercollegiate Athletics Judi Henry supervised Mr. Stephens. At all relevant times, Ms. Henry held that position.

115. The Second Internal Review involved extensive interviews with multiple people and focused not only on the Title IX complaint but again evaluated the student athletes' feedback that had been the subject of the First Internal Review.

116. The Second Internal Review was completed in late June or early July 2020.

117. On July 6, 2020, following completion of the Second Internal Review, Coach Stollings met with Mr. Hocutt. At this meeting, Mr. Hocutt confirmed that the Second Internal Review had been completed and that all issues had been addressed.

118. Mr. Hocutt specifically informed Coach Stollings that there were no findings adverse to Coach Stollings. Among other statements of support, Mr. Hocutt told Coach Stollings that the Second Internal Review found "no red flags, not even yellow flags."

119. Mr. Hocutt authorized Coach Stollings to hire an assistant coach already identified and proceed with other plans for the upcoming season.

120. Mr. Hocutt also asked Coach Stollings to agree to three action items in order to alleviate any public scrutiny of the program:

    a. Mr. Hocutt asked if Coach Stollings would consider taking a one-year moratorium from using the sports performance monitoring system that some of the transferring student athletes had criticized, and Coach Stollings, despite having used the system for years with enthusiastic feedback from prior teams, agreed not to use the system for one year;

    b. Mr. Hocutt informed Coach Stollings that some of the players had complained about the "communication style" of a particular assistant coach, and Coach

Stollings said she would talk with the staff member and keep a careful watch over that person's communications with student athletes; and

c. Mr. Hocutt stated that the team expressed a desire to get to know Coach Stollings better, and Coach Stollings said she would make a special effort to be more available for some idle time with the athletes.

## VII. USA Today Publishes A Misleading Article About The Women's Basketball Team And Mr. Hocutt Orchestrates The Termination Of Coach Stollings

121.     On August 3, 2020, a USA Today reporter contacted Coach Stollings for a comment on an upcoming article regarding the Lady Raiders.

122.     Mr. Hocutt told Coach Stollings that Texas Tech's public relations firm would help craft a response to any inquiries.   Texas Tech approved a public release from Coach Stollings that included the following: "Our administration and our staff believe in the way we are building and turning around this program here."

123.     On August 4, 2020, Mr. Hocutt telephoned Coach Stollings and reinforced his support for her, emphasizing that the results of the exhaustive internal reviews had fully found that Coach Stollings had acted correctly.

124.     The USA Today article was published on August 5, 2020 (the "Article").

125.     The Article contained numerous complaints about the Lady Raiders, almost entirely from transferring student athletes and largely reiterating the reasons for transfer provided on the NCAA transfer portal and which the internal reviews had addressed.

126.     Mr. Hocutt contacted Coach Stollings immediately after publication and again expressed his full support.

127.    Mr. Hocutt told Coach Stollings that the Article simply repeated complaints that the internal investigations had thoroughly vetted, and, since there was "no smoking gun," Coach Stollings should remain positive.

128.    In the next short period of time, Mr. Hocutt became afraid that, due to public perceptions and his own poor record, he was in danger of losing his job.

129.    Mr. Hocutt was susceptible to significant scrutiny as a result of allegations that he undertook to cover for and hide multiple disciplinary, unlawful substance – related and other law enforcement issues as well as for having forcefully advocated for student athletes, for example, to avoid discipline such as suspensions and missing athletic competitions for various offenses.

130.    On August 6, 2020, Mr. Hocutt met with Coach Stollings and gave her the option of resigning or being fired.

131.    Mr. Hocutt in essence had determined that, given particular activities and conduct that had occurred under his watch at Texas Tech, he had to sacrifice Coach Stollings' employment in order to attempt to protect his own position.

132.    Coach Stollings refused to resign.

133.    In response, Mr. Hocutt sent a letter to Coach Stollings stating that "after consulting with me, President Schovanec has determined that your actions and the situation…qualify as Objectionable Behavior according to Section IV of your employment agreement. Additionally, President Schovanec has determined that this Objectionable Behavior cannot be cured."

134.    The letter concluded by stating that Coach Stollings was being terminated for cause pursuant to Section V of the Agreement.

135.    Mr. Hocutt followed the termination with various statements both internally at Texas Tech and to the media and public that wrongfully and maliciously attacked Coach Stollings, criticizing her professional standing and integrity, and otherwise defamed her.

136.    By way of example, on August 7, 2020, Mr. Hocutt held a press conference to discuss the termination of Coach Stollings.  At the press conference, Mr. Hocutt, with malice or reckless disregard for the truth:

     a. Stated that Coach Stollings' contract was terminated with cause "based upon objectionable behavior."  Mr. Hocutt knew that Coach Stollings had not engaged in "objectionable behavior," that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

     b. Stated that Coach Stollings had "failed" the Lady Raiders by not providing the coaching necessary for them to succeed.  Mr. Hocutt knew that the Lady Raiders were performing under Coach Stollings better than they had in nearly two decades, both academically and on the court, that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

     c. Stated that Coach Stollings had not provided a "healthy environment of wellbeing" for the Lady Raider. Mr. Hocutt knew that Coach Stollings had not acted inappropriately or abusively, that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

d.   Stated that Coach Stollings had failed to establish "relationships and trust" with the Lady Raiders," and that Coach Stollings' "level of leadership" was deficient.  Mr. Hocutt knew that Coach Stollings had in fact established relationships and trust with the core of the Lady Raiders, that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

e.   Stated that Coach Stollings had "let these girls down."  Mr. Hocutt knew that Coach Stollings had worked tirelessly to support the Lady Raiders and help them succeed, that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

f.   Made comments suggesting that Coach Stollings was connected to the Title IX complaint involving the strength and conditioning coach.  Mr. Hocutt knew that Coach Stollings was not responsible for supervising the strength and conditioning coach and had nothing to do with the allegations involving him, that this statement directly contradicted the findings of the internal reviews and that the student athletes on the Lady Raiders involved with the allegations relating to the strength and conditioning coach contradicted Mr. Hocutt's malicious, reckless and false statement.

g.   Made comments suggesting that Coach Stollings lacked "high character and integrity."  Mr. Hocutt knew that Coach Stollings had not acted wrongfully, that this statement directly contradicted the findings of the internal reviews and that

almost the entire remaining student athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

137.     These statements, as well as others, are malicious, reckless and false and have damaged Coach Stollings' personal and professional reputation.

## COUNT I

### Breach of Contract

138.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

139.    Coach Stollings and Texas Tech were parties to a valid employment contract, the Agreement.  Under the terms of the Agreement, Texas Tech agreed to employ Coach Stollings until March 31, 2024, unless terminated for cause.

140.    At all relevant times, Coach Stollings performed all duties and requirements under the Agreement and was not in violation of any provision of the Agreement.

141.    On August 6, 2020, Defendants terminated Coach Stollings without having justifiable cause.

142.    By terminating the Agreement prior to March 31, 2024, Defendants materially breached the Agreement.

143.    Defendants actions alleged above have directly and proximately caused, and continue to cause, Coach Stollings to suffer economic damages.

## COUNT II

### Fraud

144.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

145.    Mr. Hocutt and other Texas Tech officials and representatives made multiple representations to Coach Stollings during the course of Coach Stollings negotiating the Agreement, while deciding whether to join Texas Tech and during her employment.  These representations included, but were not limited to, promises and representations that Texas Tech would abide by the terms of the Agreement and the duties and obligations of Texas Tech set forth in the Agreement.

146.    If public reports are correct that Defendants intend to attempt to invoke the doctrine of sovereign immunity and otherwise abrogate and disclaim their duties and obligations set forth in the Agreement, Mr. Hocutt and the other Texas Tech officials and representatives knew these statement were false.

147.    Mr. Hocutt and the other Texas Tech officials and representatives made these representations to induce Coach Stollings to become the head coach of the Lady Raiders.

148.    In reliance on these and other representations by Mr. Hocutt and the other Texas Tech officials and representatives, Coach Stollings entered into the Agreement.

149.    Without these representations, Coach Stollings would not have entered into the Agreement.

150.    Coach Stollings has been harmed by relying upon Mr. Hocutt's and other Texas Tech's officials and representatives' fraudulent representations.

## COUNT III
### Fraud

151.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

152.    Mr. Hocutt and other Texas Tech officials and representatives made multiple representations to Coach Stollings during the course of Coach Stollings negotiating the Agreement, while deciding whether to join Texas Tech and during her employment.  These representations included, but were not limited to, claims that Coach Stollings and the Lady Raiders would receive treatment equivalent to the men's basketball team and its coach.

153.    Mr. Hocutt and the other Texas Tech officials and representatives knew these statements were false, and Coach Stollings and the Lady Raiders have not been treated in a manner equivalent to the men's basketball program and its coach and do not and have never received treatment and support equivalent to the men's basketball program and its coach.

154.    Mr. Hocutt and the other Texas Tech officials and representatives made these representations to induce Coach Stollings to become the head coach of the Lady Raiders.

155.    In reliance on these and other representations by Mr. Hocutt and the Texas Tech officials and representatives, Coach Stollings entered into the Agreement.

156.    Without these representations, Coach Stollings would not have entered into the Agreement.

157.    Coach Stollings has been harmed by relying upon Mr. Hocutt's and the other Texas Tech officials and representatives' representations.

## COUNT IV

### Fraudulent Inducement

158.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

159.    Mr. Hocutt and other Texas Tech officials and representatives made multiple representations to Coach Stollings to induce Coach Stollings to enter into the Agreement.  These

representations include, but are not limited to, representations concerning the grounds under which Texas Tech could or would terminate the Agreement.

160.    Mr. Hocutt and other Texas Tech officials and representatives represented and otherwise promised that Texas Tech would abide by their duties and obligations set forth in the Agreement, including that Texas Tech would not terminate the Agreement unless Coach Stollings breached the Agreement and that Coach Stollings could and would have the protections in the Agreement to protect and enforce her rights and interests set forth in the Agreement.

161.    Mr. Hocutt and other Texas Tech officials and representatives represented and otherwise promised that Coach Stollings and the Lady Raiders would receive treatment equivalent to the men's basketball team and its coach.

162.    Mr. Hocutt and the other Texas Tech officials and representatives knew that these statements were false or made the representations recklessly and without any knowledge of their truth.

163.    Mr. Hocutt and the other Texas Tech officials and representatives made these representations with the intent that Coach Stollings would rely upon them and execute the Agreement.

164.    In reliance upon Mr. Hocutt's and the other Texas Tech officials and representatives' statements, Coach Stollings entered into the Agreement.

165.    Coach Stollings has been harmed by relying upon Mr. Hocutt's and the other Texas Tech officials and representatives' representations.

## COUNT V
### Defamation

166.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

167.    Mr. Hocutt is a non-media defendant.

168.    Following the termination of Coach Stollings, Mr. Hocutt made multiple malicious, knowingly reckless and false statements concerning Coach Stollings in her personal and professional capacity.

169.    These statements were malicious, made in reckless disregard of the truth and knowingly false in their particular details, in their central points, and in the context in which they were made.

170.    Mr. Hocutt acted maliciously in order to preserve his own position by making these statements in order to deflect blame onto Coach Stollings.

171.    Mr. Hocutt knew or should have known that the defamatory statements were malicious, were made with reckless disregard and were knowingly false.

172.    Mr. Hocutt's actions described above have directly and proximately caused, and continue to cause, Coach Stollings to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

173.    Coach Stollings has been harmed as a result of Defendants' conduct alleged herein.

## COUNT VI
### Defamation Per Se

174.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

175.    Following the termination of Coach Stollings, Mr. Hocutt made multiple malicious, reckless and knowingly false statements concerning Coach Stollings in her personal and professional capacity.

176.   These statements were defamatory per se because they injured Coach Stollings' personal and professional reputation, have exposed Coach Stollings to public hatred, contempt, ridicule and financial injury, and impeach Coach Stollings' honesty, integrity, virtue and reputation.

177.   Mr. Hocutt's statements directly and indirectly claim that Coach Stollings acted with moral turpitude which breached the Agreement and necessitated her termination.

178.   Mr. Hocutt's actions described above have directly and proximately caused, and continue to cause, Coach Stollings to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

179.   Coach Stollings has been harmed as a result of Defendants' conduct alleged herein.

## COUNT VII

**Sex Discrimination on the Basis of Coach Stollings' Sex in Violation of the Education Amendments Act of 1972 (Title IX), 20 U.S.C. §§ 1681, *et seq.***

180.   Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

181.   Title IX and its implementing regulations prohibit a recipient of federal funding from discriminating against an employee in education-related employment on the basis of sex, including in rates of pay or any other form of compensation and changes in compensation, job assignments, fringe benefits available by virtue of employment, employer-sponsored activities, including those that are social and recreational, termination, and any other term, condition or privilege of employment.  34 C.F.R. §106.51.

182.   At all times relevant to this Complaint, Texas Tech was an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

183. At all times relevant to this Complaint, Coach Stollings was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations.

184. Defendants discriminated against Coach Stollings because of her sex (female) by subjecting her to disparate treatment as compared to similarly situated male coaches, including but not limited to coaches of male sports teams, and terminating her employment because of sex.

185. Defendants also discriminated against Coach Stollings – and others – because she was a member of the gay and lesbian community employed by Texas Tech in the Athletics Department.

186. Defendants' actions constitute discrimination in violation of Title IX and its implementing regulations.

187. Defendants' actions described above directly and proximately caused, and continue to cause, Coach Stollings to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

## **COUNT VIII**

### **Violation Of Constitutional And Civil Rights Pursuant To 42 U.S.C. § 1983 And The Equal Protection Clause**

188. Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

189. Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex.   This constitutional right is clearly established.

190.    Pursuant to 42 U.S.C. § 1983, parties acting under color of state law who violate an individual's constitutional rights can be held liable for damages.

191.    At all times relevant to this Complaint, Coach Stollings was an employee of a public institution, Texas Tech.

192.    Defendants, acting under color of state law, violated Coach Stollings' constitutional right to be free from sex discrimination in employment, including by directly participating and orchestrating the termination of her contract with Texas Tech for conduct and activities with regard to the women's basketball program that, even if accurately described by Defendants, Defendants not only have tolerated but endorsed for men's sports teams and thereby adversely affected the terms and conditions of Coach Stollings' employment and subjected her to disparate treatment and disparate discipline.

193.    Defendants, acting under the color of state law, violated Coach Stollings' constitutional right to be free from sex discrimination in employment by subjecting her to disparate treatment and disparate discipline as alleged above.

194.    Defendants violated Coach Stollings' constitutional right to be free from sex discrimination in employment by terminating her employment because she was a member of the gay and lesbian community employed in the Athletics Department.

195.    As a direct result of the actions, statements and/or policies of Texas Tech, Mr. Hocutt and Texas Tech officials and representatives, Coach Stollings has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

196.    Defendants acted intentionally and with callous disregard for Coach Stollings' known statutory and constitutional rights.

197.    Defendants' conduct alleged above has directly and proximately caused, and continues to cause, Coach Stollings to suffer loss of income and other financial benefits, loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

## COUNT IX

### Declaratory Judgment

198.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

199.    The Agreement between Coach Stollings and Texas Tech provided that Coach Stollings could not be terminated prior to the expiration of the term of the Agreement unless there was cause.

200.    Texas Tech's own internal reviews found that no cause for termination existed, as Coach Stollings had acted properly and within the boundaries of the Agreement at all times.

201.    At the same time, Texas Tech continues to hire and retain male coaches and, specifically, coaches of men's sports teams who engage in far more aggressive behavior towards student-athletes, including abuse.

202.    Coach Stollings requests the Court to issue a declaratory judgment finding that she was not in breach of the Agreement and that Texas Tech terminated the Agreement without cause.

203.    Following the termination of Coach Stollings, Mr. Hocutt made multiple malicious, knowingly reckless and false statements concerning Coach Stollings in her personal and professional capacity.

204.    Coach Stollings requests the Court to issue a declaratory judgment finding that these statements were malicious, made in reckless disregard of the truth and knowingly false in their particular details, in their central points and in the context which they were made.

31

205.    Coach Stollings requests the Court to issue a declaratory judgment finding that these statements have exposed Coach Stollings to public hatred, contempt, ridicule and financial injury, and impeach Coach Stollings' honesty, integrity, virtue and reputation.

206.    Coach Stollings has no other adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Marlene Stollings seek judgment in her favor and against Defendants as follows:

(i)     Awarding Coach Stollings compensatory damages, general damages, special damages, nominal damages, statutory damages and punitive damages in an amount to be proved at trial for breach of contract, fraud, fraudulent inducement, defamation, defamation per se, and violations of Title IX, 42 U.S.C. § 1983 and the Equal Protection Clause of the United States Constitution;

(ii)    A declaratory judgment that Defendants breached the employment contract with Coach Stollings without cause;

(iii)   A declaratory judgment that Defendant Kirby Hocutt's statements were malicious, knowingly reckless and false;

(iv)    A declaratory judgment that Defendant Kirby Hocutt's statements injured Coach Stollings' personal and professional reputation, have exposed Coach Stollings to public hatred, contempt, ridicule and financial injury, and impeach Coach Stollings' honesty, integrity, virtue and reputation;

(v)     Reasonable attorneys' fees;

(vi)    Costs; and

(vii)   Such further relief as the Court deems just and proper.

Dated:  October 20, 2020

MAYFIELD, RAHLFS, WEABER & PARSONS, LLP

By:      /s/ Angelique Weaver_____
         Angelique Weaver
         Texas Bar No. 24008247
         1001 Main St., Suite 504
         Lubbock, TX 79401
         (806) 722-1616
         (806) 722-1614 (fax)
         aweaver@mayfield-lawfirm.com

         Tod Mayfield
         Texas Bar No. 00787985
         tmayfield@mayfield-lawfirm.com
         Joseph Parsons
         Texas Bar No. 24067815
         jparsons@mayfield-lawfirm.com
         320 S. Polk, Ste 400
         Amarillo, TX 79101
         (860) 242-0152


MICHELMAN & ROBINSON, LLP

By:      /s/ Peter R. Ginsberg_____
         Peter R. Ginsberg (*pro hac vice pending*)
         800 Third Avenue, 24th Floor
         New York, New York 10022
         (212) 730-7700
         pginsberg@mrllp.com

         *Attorneys for Plaintiff Marlene Stollings*