UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
------------------------------------------------------------------X
MARLENE STOLLINGS,

                              Plaintiff,

        -against-

TEXAS TECH UNIVERSITY and KIRBY HOCUTT,

                            Defendants.

------------------------------------------------------------------X

Civil Action No.:
5:20-cv-00250-H

**SECOND AMENDED COMPLAINT**

**Jury Trial Demanded**

By her attorneys Moskowitz and Book, LLP, and Mayfield Law Firm, LLP, Plaintiff Marlene Stollings brings her Second Amended Complaint against Defendants Texas Tech University and Kirby Hocutt, and alleges as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of contract, fraud, fraudulent inducement, defamation, sex discrimination in violation of the right to equal protection under the United States Constitution and in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and specific performance.

2.     Plaintiff Marlene Stollings ("Coach Stollings") is the former Head Coach of the Texas Tech Lady Raiders ("Lady Raiders"), which represents Texas Tech University ("Texas Tech") in the Big 12 Conference for NCAA Division I (D-I) women's basketball.

3.     In 2018, Coach Stollings entered into an employment agreement with Texas Tech to serve as the Head Women's Basketball Coach from April 11, 2018 to March 31, 2024.

4.     Coach Stollings was chosen specifically to revitalize the Lady Raiders, which was one of the worst-performing and dysfunctional programs in the country.

5.    Upon arrival, Coach Stollings worked tirelessly to improve the academic and athletic performance of her student-athletes.

6.    During this time, Texas Tech maintained a culture which discriminated against female and gay and lesbian personnel in favor of male and heterosexual personnel, including coaches.

7.    Despite the discriminatory culture, Coach Stollings provided a fair and reasonable approach designed to bring out the best in the Lady Raiders.

8.    As the head of the Lady Raiders, Coach Stollings advocated on behalf of her players for equitable funding and resources, and for fair and decent treatment.

9.    On or about March 25, 2020, Coach Stollings was informed of sexual harassment allegations involving a member of the coaching staff, the strength and conditioning coach. Consistent with her commitment to the student-athletes on the Lady Raiders, Coach Stollings immediately reported the issue to the Texas Tech Athletic Department.

10.    As a result of Coach Stollings' reporting of the allegations, a Title IX investigation commenced.

11.    During the Title IX investigation, Coach Stollings provided full transparency and cooperation.

12.    The reporting and the participation in the Title IX investigation threatened to embarrass the Texas Tech Athletic Department, including, and perhaps most importantly, Athletic Director Kirby Hocutt ("Mr. Hocutt").

13.    Upon information and belief, and based upon his actions and attitude, Mr. Hocutt expected such matters to be kept quiet and felt betrayed by Coach Stollings' adherence to her principles and to the legal requirements applicable in such situations.

14.     Mr. Hocutt concluded that he did not have a "loyal soldier" guiding the women's basketball team following Coach Stollings' reporting of the allegations about the strength and conditioning coach to the proper authorities at Texas Tech, and began to retaliate against her.

15.     Coach Stollings' efforts to obtain adequate support and resources for women's athletics, including women's basketball, also were met with resistance.  Texas Tech and Mr. Hocutt ignored these requests and began retaliating against Coach Stollings for violating the unwritten rule that female and gay and lesbian coaches were required to accept lesser treatment than male and heterosexual coaches.

16.     Throughout Coach Stollings' tenure as women's head basketball coach, Texas Tech and Mr. Hocutt continued to compromise the resources provided to women's basketball.

17.     Coach Stollings' efforts to obtain better resources for the Lady Raiders likewise caused Mr. Hocutt to conclude that he did not have a "loyal solider" guiding the women's basketball team.

18.     Despite the tensions between Coach Stollings and Mr. Hocutt over issues that included Coach Stollings' insistence upon adherence to laws designed to protect female student-athletes and efforts to obtain sufficient and fair support and resources for the Lady Raiders and women's sports throughout Texas Tech, Coach Stollings' methods worked.  Following several years of losing seasons and low academic performance, the Lady Raiders began to achieve greater success both on and off the court.

19.     With the increased dedication to excellence and hard work in the women's basketball program, some of the student-athletes did not want to provide the energy and resources needed to achieve success.

20.     As a result of the increased expectations, some of the student-athletes decided to transfer to less-demanding or less-competitive programs.

21.     In order to secure a transfer and continue playing without interruption, NCAA rules require that student-athletes must claim that the transfer is based on a desire to avoid a negative atmosphere or for physical and mental health reasons.

22.     As a result, some of the departing student-athletes provided negative feedback about their experiences with the Lady Raiders.

23.     In partial response to complaints from NCAA waivers from transferring student-athletes, Texas Tech ultimately conducted two internal reviews of the Lady Raiders and the women's basketball program.

24.     The internal reviews, which involved multiple members of the Athletics Department and extensive interviews with student-athletes, staff and coaches, determined that Coach Stollings had not acted inappropriately or abusively and that any complaints to the contrary were unfounded.

25.     At some point during the course of the second internal review, a USA Today reporter began working on an article about the Lady Raiders, which focused on interviews with former student-athletes.

26.     The USA Today article was published on August 5, 2020, and included unsubstantiated claims and factual misrepresentations regarding the Lady Raiders and Coach Stollings, almost entirely from transferring student-athletes and largely echoing the explanations that transferring team members used to try to obtain immediate eligibility at another institution. Those same complaints had already been investigated and rejected by Texas Tech internal investigations.

4

27.     Prior to and following the publication of the USA Today article, Mr. Hocutt personally assured Coach Stollings that she had the full support of Texas Tech, emphasizing and reiterating that the internal investigations had already thoroughly examined the same complaints and issues and concluded that the complaints were without basis or justification.

28.     At the same time, Mr. Hocutt, upon information and belief, was myopically focused on how to salvage his own job in the wake of multiple internal and external crises involving the Athletic Department and, with the USA Today article, more attention on his performance.

29.     Indeed, due to negative publicity following the USA Today article, Mr. Hocutt's concern that his own position was at risk heightened and Mr. Hocutt began to create a strategy for deflecting blame.

30.     Mr. Hocutt maneuvered to have Coach Stollings terminated to serve his own best interests: to rationalize to the outside world that Coach Stollings' termination was warranted; to hide the fact that the termination was designed to protect Mr. Hocutt's employment; and, to rid himself of a head coach who had made known that she would unwaveringly act in the best interests of the Lady Raiders and women's sports at Texas Tech.

31.     On August 6, 2020, at Mr. Hocutt's urging, and consistent with his strategy to protect his own employment at all costs – even when the cost included, as it did in this instance, harm to the Athletic Department and Texas Tech – Texas Tech terminated Coach Stollings' employment contract, purportedly for cause.

32.     The termination was contrary to Texas Tech's best interests.

33.     In addition, Coach Stollings' termination could not properly have been for cause. Texas Tech's own internal reviews had found—accurately—that Coach Stollings had not taken any actions which were in violation of her employment contract.

34.     Moreover, Texas Tech's decision to terminate Coach Stollings was based on discriminatory biases against female and gay and lesbian coaches and another chapter in Texas Tech's and Mr. Kirby's mistreatment of females in the Athletic Department and members of the gay and lesbian community.

35.     Texas Tech and Mr. Hocutt regularly, and in this instance in particular, penalized female and gay and lesbian coaches for employing the same demanding and effective coaching techniques that male and heterosexual coaches utilized and continue to utilize without consequence. Texas Tech has regularly hired and continues to employ male and heterosexual coaches who engage in confirmed, more-extreme practices and procedures than any methods Coach Stollings ever used.

36.     Coach Stollings is one of four members of that community who were victimized in 2020 alone by Defendants' discriminatory treatment of community members employed by the Texas Tech Athletic Department.

37.     Of the four members of the gay and lesbian community who were terminated, including Coach Stollings, two were replaced with heterosexual coaches, one position was disbanded, and one position has not yet been filled.

38.     It also is not coincidental that Texas Tech and Mr. Hocutt's Athletics Department were able to save over a quarter million dollars per year in salary for Coach Stollings' replacement and the new staff hiring, continuing the trend of compromising resources for women's sports and, in particular, for women's basketball, in contrast to the funding of men's athletics.

39.     Following her termination, Mr. Hocutt made knowingly false and malicious defamatory public statements concerning Coach Stollings as a person and as a coach.  Mr. Hocutt's knowingly false and malicious statements were designed to support his strategy of sacrificing

Coach Stollings in order to preserve his own employment and standing and, as such, acted contrary to the best interests – and supposed values – of Texas Tech.

40.     Texas Tech and Mr. Hocutt have grievously harmed Coach Stollings' career and damaged Coach Stollings ability to secure future coaching positions, in addition to causing her severe emotional injury.

## PARTIES

41.     Plaintiff Marlene Stollings at all relevant times was an individual Texas resident residing in Lubbock, Texas.

42.     Defendant Texas Tech University is a public university located in Lubbock County, Texas, which seeks and receives federal financial assistance for its education and athletic programs and activities.

43.     Defendant Kirby Hocutt is an individual who is employed by Defendant Texas Tech University as its Athletic Director and, upon information and belief, is a Texas resident residing in Lubbock County.  Defendant Kirby Hocutt is sued in his official capacity for certain claims for relief and in his individual capacity for certain claims for relief as set forth below.

## JURISDICTION AND VENUE

44.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a)(3)-(4), as this matter arises under the Constitution and laws of the United States. This Court has supplemental jurisdiction over the state and common law claims herein alleged under 28 U.S.C. § 1367(a), as they arise out of a common nucleus of operative facts as the federal law claims.

45.     Venue and jurisdiction are proper in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial number of the events, acts or omissions giving rise to Plaintiff Marlene Stollings' claims occurred within the boundaries of this judicial district.

## FACTUAL BACKGROUND

I.     **Coach Stollings Had A Successful Career As A Women's Basketball Coach Prior To Texas Tech**

46.     As a star basketball player, Coach Stollings achieved recognition in high school and at Ohio University, before playing professionally in the National Women's Basketball League ("NWBL") and in Europe.

47.     In 2000, Coach Stollings began her college coaching career as an assistant coach with the women's basketball program at Jacksonville University.

48.     Over the next decade, Coach Stollings served in various coaching positions with several women's collegiate basketball programs.

49.     In 2011, Coach Stollings became the head women's basketball coach at Winthrop University ("Winthrop") and achieved an 18-13 record in her first season.

50.     This was a remarkable achievement, as Winthrop only had one prior winning season in the past 26 years.

51.     In recognition of her success, Coach Stollings was awarded the 2012 Big South Conference Coach of the Year in women's basketball.

52.     In 2012, Coach Stollings became the head women's basketball coach at Virginia Commonwealth University ("VCU").

53.     By 2013, under Coach Stollings' guidance, VCU's basketball program had greatly improved, resulting in a trip to the 2014 Women's National Invitation Tournament.  VCU's 22

wins in Coach Stollings' second year were the third most wins in school history and ranked in the nation's top five turnarounds.

54.     In 2014, Coach Stollings became the head women's basketball coach at the University of Minnesota ("Minnesota").

55.     Coach Stollings' efforts resulted in immediate success.  For the first time since 2009, Minnesota went to the 2015 NCAA Division I Women's Basketball Tournament.  In 2018, Minnesota made it to the second round of the NCAA Division I Women's Basketball Tournament, culminating in Minnesota's best season in 13 years.  Coach Stollings coached five Women's National Basketball Association draft picks, two Players of the Year and one Freshman of the Year while at Minnesota.

## II.     Athletic Director Kirby Hocutt's Problematic History Running Athletic Programs

56.     In 2011, Mr. Hocutt left the University of Miami, Florida to become the Director of Athletics at Texas Tech.  Mr. Hocutt held that same position during most of the time period when University of Miami athletics, primarily football and basketball, were corrupted by improper benefits boosters gave to student-athletes from 2002 to 2010.  The University of Miami, several coaches, and a dozen players were sanctioned and disciplined for this conduct, but somehow Mr. Hocutt, who was responsible for the corrupted program, avoided punishment.

57.     While serving as the Ohio University Athletic Director, Mr. Hocutt announced in January 2007 the elimination of four varsity sports, including the women's lacrosse team.  Mr. Hocutt gave no advance notice to the student-athletes on those eliminated teams, compromising their ability to play intercollegiate athletics or engage in the activities that Ohio University and Mr. Hocutt had promised would be available when the student-athletes committed to matriculating at Ohio University.  At Mr. Hocutt's direction, Ohio University transferred the money saved from

funding those programs to teams that were generating revenue for Ohio University, and especially to the men's football and basketball programs.

58.     As the Athletic Director, Mr. Hocutt is responsible for supervising all collegiate sports at Texas Tech.

59.     As part of his duties, Mr. Hocutt is responsible for assuring the integrity of the entire athletic program and for recruiting, vetting and hiring head coaches and staff for Texas Tech's athletic program.

60.     Texas Tech has overlooked and covered up abuses under Mr. Hocutt's regime, including multiple disciplinary and criminal issues arising within the Texas Tech men's basketball and football programs and involving the conduct of certain male coaches of Texas Tech teams.  As long as the men's sports teams performed well and Texas Tech reaped the financial rewards, Texas Tech and Mr. Hocutt were willing to ignore and otherwise cover-up such activities.  In 2019, Texas Tech's teams obtained a National Title in men's track, a National Title Game in men's basketball and a College World Series appearance.

61.     One example of Mr. Hocutt's role in covering up abuses in the men's athletic program, and Texas Tech's complicity, occurred in March 2011, after Mr. Hocutt drove the hiring of Billy Gillespie ("Coach Gillespie") as the head coach for the men's basketball team.

62.     In 2012, after just one year on the job, Mr. Hocutt allowed Coach Gillespie to resign ostensibly for "health reasons."   In fact, upon information and belief, numerous players had complained to Mr. Hocutt about accusations of mistreatment and offensive conduct throughout the year.  Mr. Hocutt and Texas Tech covered up the mistreatment and offensive conduct and allowed Coach Gillespie to avoid being terminated for cause, which would have resulted in public dissemination of the abuse in the men's basketball program.

10

III.     **The Lady Raiders**

63.     The Lady Raiders have a proud history.  Coach Marsha Sharp ("Coach Sharp") coached the Lady Raiders to regular conference championships and deep runs in the NCAA Division I Women's Basketball Tournament as head coach from 1982 to 2006.  In 1993, Coach Sharp won the NCAA Championship.

64.     Following the 2005-2006 season, Coach Sharp retired from coaching, after which the Lady Raiders began a steady decline.

65.     From 2006 to 2012, the Lady Raiders only made it to the NCAA Division I Women's Basketball Tournament twice, and never past the first round.

66.     For college athletic programs, success is often dependent on capable coaches who can recruit talented student-athletes to their programs, as well as bring out the best performances from their players.

67.     Therefore, successful coaches often develop self-perpetuating cycles, as winning programs naturally attract the most talented and driven student-athletes.

68.     Underperforming college athletic programs, on the other hand, often create dysfunctional cycles, as losing teams and unproven coaches have difficulty recruiting and retaining top-tier student-athletes.

69.     As a result, underperforming college athletic programs often continue to underperform absent a coach capable of both recruiting more talented student-athletes and obtaining better performances from the current student-athletes.

70.     In 2013, Mr. Hocutt hired Candi Whitaker ("Coach Whitaker") as the Lady Raider's coach.

11

71.     Over four seasons, Coach Whitaker did not finish a single season with a winning record and did not once make it to the NCAA Division I Women's Basketball Tournament or the Women's National Invitation Tournament.  Coach Whitaker was fired midway through her fifth season, on January 1, 2018.

72.     By 2018, Mr. Hocutt was facing severe criticism due to his mismanagement of the Lady Raiders and Texas Tech's football team, among other programs.

73.     Mr. Hocutt desperately needed a coach who was capable of rapidly revitalizing the Lady Raiders.

74.     This task was especially difficult because, after consecutive losing seasons and no playoff appearances, the Lady Raiders were struggling with recruiting in addition to subpar on-court performance.

## IV.    Texas Tech Hires Coach Stollings

75.     In 2018, Texas Tech approached Coach Stollings about taking over the Lady Raiders.

76.     Given Coach Stollings' record of turning around underperforming programs at Winthrop, VCU and Minnesota, Texas Tech was eager for Coach Stollings to achieve similar results with the Lady Raiders.

77.     On April 9, 2018, Coach Stollings entered into an employment contract with Texas Tech (the "Agreement").

78.     Both explicitly and implicitly, Mr. Hocutt and other Texas Tech officials and representatives represented and otherwise promised that Texas Tech recognized the sanctity of contracts and would abide by the Agreement's terms, conditions and obligations.  Mr. Hocutt,  like the other Texas Tech officials and representatives involved in the recruiting of Coach Stollings

12

and the negotiation of Coach Stollings' Agreement, never suggested that Texas Tech under any circumstances would hide behind or attempt to avoid responsibility for Texas Tech's duties and obligations by invoking the doctrine of sovereign immunity or any other shield, or otherwise seek to avoid and abrogate Texas Tech's contractual obligations.

79.     Indeed, contrary to Texas Tech's previous legal position that Texas Tech enjoyed immunity from any effort to force it to abide by the terms of its agreements with members of the University community, including members of the Athletic Department, Mr. Hocutt repeatedly, orally and in writing, represented and otherwise promised that Texas Tech would abide by all of the terms of its agreement with Coach Stollings.

80.     Without such representations and promises, Coach Stollings never would have agreed to accept employment at Texas Tech and, indeed, there otherwise would have been no reason to memorialize in writing the terms and conditions of their agreement.  No person, including any member of the Athletic Department, would ever agree to work at Texas Tech without a mutual commitment to the sanctity of agreements, representations, and promises.

81.     Under Section I of the Agreement, Texas Tech agreed to employ Coach Stollings as the Head Women's Basketball Coach from April 11, 2018 to March 31, 2024.

82.     Under Section III(A) of the Agreement, Texas Tech agreed to compensate Coach Stollings by paying and otherwise guaranteeing an annual salary and other compensation until at least March 31, 2024, with the possibility of an extension to March 31, 2025, if the Lady Raiders were selected and participated in the NCAA Women's Basketball Tournament at least twice.

83.     Under Section III(A), Stollings was guaranteed an annual base salary of $300,000, running from April 1 to March 31 of each year.

84.     Under Section III(C)(4) and (5), Coach Stollings was entitled to fees up to $500,000 for Coach Stollings' "Outside Athletics Related Income (Rights Fees)" and "Supplemental Compensation," ranging from $10,000 for the student-athletes on her team maintaining a Team GPA over 2.65, to $100,000 for a National Championship Game win.

85.     Under Section V(A) of the Agreement, Texas Tech could terminate the Agreement for cause only if, "based on substantial evidence," Coach Stollings failed to perform her duties or acted in harmful or inappropriate ways, such as a "failure or refusal to perform assigned duties" or "serious violation of local, state, or federal laws."

86.     Additionally, Coach Stollings could also be terminated for cause under Section V(A) for engaging in "Objectionable Behavior," which was defined in Section IV of the Agreement as:

> behavior, actions or activities that (i) subject either Coach or University to substantial ridicule or embarrassment; (ii) substantially adversely affects Coach's or University's reputation; (iii) substantially interferes with or substantially diminishes Coach's standing as a University ambassador and representative; or (iv) are substantially contrary to the best interests of the University, its students, or its athletic program.

87.     Under Section V(A) of the Agreement, Texas Tech was required to give Coach Stollings "written notice and an opportunity to cure prior to termination pursuant to [Section V(A)], provided that such cause can be cured as determined by the University's President."

88.     If the Agreement were terminated for cause, Texas Tech's "sole obligation" to Coach Stollings would "be to pay her Base Salary until the effective date of termination in addition to any Rights Fees and Supplemental Compensation earned as of the date of termination."

89.     Under Section V(C) of the Agreement, in the event Texas Tech terminated Coach Stollings without cause, Texas Tech would be required to "pay liquidated damages to Coach

[Stollings] in an amount equal to Seventy-Five Percent (75%) of the remaining Base Salary and Rights Fees."

## V.    Coach Stollings Faced Discriminatory Treatment From The Start

90.    Under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, and their implementing regulations, it is unlawful to discriminate on the basis of sex or to retaliate against those who engage in protected activities under these statutes.

91.    In violation of these laws, Texas Tech and Mr. Hocutt created an environment in which male and heterosexual coaches were treated better than female and gay and lesbian coaches, and men's athletic programs were treated better than female athletic programs.

92.    From the moment Texas Tech hired her, Coach Stollings faced discriminatory treatment.

93.    Texas Tech administrators, and Mr. Hocutt in particular, regularly made derogatory remarks about women and women's sports directly to and around Coach Stollings.

94.    By way of example, Mr. Hocutt remarked how he had found it "painful" to watch women's basketball, and that he only attended Lady Raider games because he was required to do so.

95.    By way of further example, Mr. Hocutt stated on multiple occasions that women and women's athletic programs are problematic because they "have drama," while men and men's athletic programs do not.

96.    By way of further example, Mr. Hocutt stated on multiple occasions that he was glad that he had male children instead of female children, because women "are filled with drama."

97.    These attitudes demonstrated that Texas Tech, and Mr. Hocutt in particular, believed that women were overly emotional and untrustworthy, in contrast to men.

98.    Moreover, Texas Tech administrators, and Mr. Hocutt in particular, would act dismissively or patronizingly towards Coach Stollings.

99.    By way of example, Mr. Hocutt complained that Coach Stollings was too focused on "records" or "high points."

100.    Texas Tech and Mr. Hocutt never suggested that male coaches or men's athletic programs were too focused on "records" or "high points."

101.    Moreover, Texas Tech deprived Coach Stollings and the Lady Raiders of resources and benefits sufficient to operate the women's basketball team in a manner equivalent to men's sports teams, including the men's basketball team.

102.    By way of example, Coach Stollings asked that Mr. Hocutt assign a specific staff member to coordinate fundraising for the Lady Raiders. Texas Tech never assigned a staff member to provide fundraising for the Lady Raiders.

103.    One result of this failure was that Coach Stollings was unable to take the Lady Raiders on a foreign tour, an event which the NCAA permits teams to make every four years. These foreign tours are excellent opportunities to raise visibility and provide unique experiences for student-athletes.

104.    In comparison, Texas Tech ensured that the men's basketball team went on its foreign tour.

105.    By way of further example, the men's basketball team had a staff nutritionist who was assigned to it.

16

106.    The Lady Raiders were forced to use the men's basketball team's nutritionist.  As a result, the Lady Raiders were given subpar and inadequate care and attention.

107.    By way of further example, Mr. Hocutt demonstrated his low opinion of the Lady Raiders by rarely attending Lady Raider practices.  In fact, despite later contending that he had been concerned about Coach Stollings' coaching methods and actions during practice, Mr. Hocutt came to practice approximately three times per year, for approximately 20 minutes each time.

108.    Furthermore, Mr. Hocutt never once traveled with the team during Coach Stollings' tenure, even when the Lady Raiders were participating in tournaments.  Mr. Hocutt did not attend a single away game in two years despite Coach Stollings consistently extending invitations to Mr. Hocutt, making seats available on charter flights, and providing him with a travel calendar with all departure times in advance of each season.

109.    In comparison, Mr. Hocutt regularly attended men's basketball team practices and games.

110.    By way of further example, the discrepancy between Texas Tech's financial support for male teams and female teams is profound.

111.    Texas Tech is required to publish an annual report pursuant to the Equity in Athletics Disclosure Act.  These reports can be used to measure the discrepancies in funding between male and female teams.

112.    "Operating expenses" are defined in the 2019 Report as "all expenses an institution incurs attributable to home, away, and neutral-site intercollegiate athletic contests (commonly known as "game-day expenses"), for (A) Lodging, meals, transportation, uniforms, and equipment for coaches, team members, support staff (including, but not limited to team managers and trainers), and others; and (B) Officials."

113.    In the 2019 Report, Texas Tech reported that the men's basketball team had total operating expenses of $3,727,213, or $266,230 per participant.

114.    In comparison, for 2019, the Lady Raiders had total operating expenses of $1,202,203, or $92,477 per participant.

115.    "Total expenses" are defined in the 2019 Report as including "appearance guarantees and options, athletically related student aid, contract services, equipment, fundraising activities, operating expenses, promotional activities, recruiting expenses, salaries and benefits, supplies, travel, and any other expenses attributable to intercollegiate athletic activities."

116.    In the 2019 Report, Texas Tech reported that the men's basketball team had total expenses of $9,020,201.

117.    In comparison, for 2019, the Lady Raiders had total expenses of $4,983,413.

118.    There is no non-discriminatory explanation nor is there an appropriate rational for compromising the operations and standards of the Lady Raiders by failing to provide necessary resources and support to such an extreme degree.  While the dollar-for-dollar comparison between male and female sports programs need not be exact, the resources and support for each program must be sufficient for the programs to be able to perform at an equivalent level.

119.    Texas Tech, and Mr. Hocutt in particular, fostered an environment which saw women and gays and lesbians as inferior, and penalized female and gay and lesbian coaches who refused to conform.

120.    By way of further example, Texas Tech and Mr. Hocutt supervised and disciplined coaches differently.

121.    Under Mr. Hocutt's supervision, men's athletic programs at Texas Tech were plagued by frequent instances of inappropriate, at times criminal, behavior.  Male student-athletes

would be arrested or otherwise involved in criminal activity, assistant coaches would get in trouble, NCAA regulations would be violated, and there was regular drug use throughout many of these programs.

122.    Texas Tech and Mr. Hocutt ignored these issues, and rarely, if ever, reprimanded the male head coaches.  Indeed, Mr. Hocutt made efforts to cover-up, and otherwise ignored, such violative behavior.

123.    In contrast, Texas Tech, and Mr. Hocutt in particular, expected female coaches to exhibit stereotypically feminine behavior.

124.    Texas Tech, and Mr. Hocutt in particular, were unwilling to accept a woman, and especially a lesbian woman, who demanded equal treatment, and looked for opportunities to discipline and retaliate against Coach Stollings.

VI.    **Texas Tech Conducts An Initial Review Of The Women's Basketball Program**

125.    Upon arrival, Coach Stollings dedicated herself to the Lady Raiders. The Lady Raiders began to show immediate progress.

126.    Following the previous coach's 54-82 record over a five-year period, the Lady Raiders achieved a winning record under Coach Stollings and qualified for post-season play for the first time in seven years.

127.    Not only were the Lady Raiders succeeding on the court, but off the court as well. Under Coach Stollings' guidance, the Lady Raiders, which had previously been one of the lowest academically performing teams, achieved the highest cumulative GPA at Texas Tech in less than two full years.

128.    As Coach Stollings and Texas Tech officials, including Mr. Hocutt, had discussed at the beginning of Coach Stollings tenure, it was expected that as Coach Stollings increased

19

expectations and recruited higher-caliber student-athletes, some current student-athletes would transfer chiefly to less-demanding, less-competitive programs.

129.    In late summer 2019, Coach Stollings learned that certain departing student-athletes had provided negative feedback concerning their experiences at Texas Tech.

130.    These comments were expected and commonplace among NCAA transferring student-athletes.  The NCAA transfer policies require transferring student-athletes to file transfer applications to obtain waivers.

131.    An applicant seeking to obtain immediate eligibility to play for another institution must convince the NCAA that she or he is transferring in order to avoid a negative atmosphere or to safeguard her or his physical or mental health.

132.    In short, a transferring student-athlete essentially is forced to provide negative feedback in order to receive NCAA approval to play immediately for another institution.

133.    One of the subjects of the negative comments involved a physical monitoring system that Coach Stollings has used for years to measure, for example, heart rates and pulse during practice to evaluate effort and conditioning.  Some of the student-athletes complained that they felt intimidated by the use of the monitoring.

134.    In fact, student-athletes generally welcome the system and the fact that objective, rather than subjective, analytics are used to determine whether, for example, greater effort is possible and whether the players are being over or under worked, to provide additional protection against injury, and to aid recovery.

135.    The men's basketball coaching staff, as well as several other Texas Tech coaching staffs, historically have used and continue to use a similar monitoring system without scrutiny.

20

136.    Other transferring student-athletes complained about being pushed too hard at practice.

137.    Believing those claims, not only did Coach Stollings make every Lady Raiders practice open to the general public, administrators, and members of the Texas Tech community, but Coach Stollings also ensured that every practice was videotaped.  Not a single complaint or concern was ever raised about the student-athletes being pushed too hard or about any other inappropriate conduct or language nor does any video reflect inappropriate conduct by Coach Stollings or her staff.

138.    In contrast, the men's basketball practices are closed to the public, in part to assure that the coaches are not restrained in how they conduct practices or the methods or language they use.

139.    After reviewing the transfer applications, Texas Tech delegated Sandy Collins, the Associate Athletic Director, and Greg Glaus, the Senior Associate Athletic Director, to conduct an internal review to evaluate the negative feedback.  The internal review lasted from December 9 to December 16, 2019.  (The "First Internal Review.")

140.    The First Internal Review committee examined four areas: (1) "Fear of retaliation for seeking mental health counseling or medical care"; (2) "Excessive force in drills by Niki Dawkins"; (3) "Public humiliation about body and weight"; and (4) "Egregious behavior that is detrimental to the student-athlete well-being."

141.    The investigative committee conducting the First Internal Review interviewed multiple coaches, administrators, and other individuals involved with the Lady Raiders, and also reviewed all waiver documentation and Real Recruit feedback.

21

142.    After an exhaustive investigation, the investigative committee concluded that "[n]othing … lead to this conclusion" that egregious or detrimental behavior had occurred.

143.    The investigative committee noted that Coach Stollings was fully cooperative and forthcoming.

144.    The Report generated by the First Internal Review also noted:

   a.    "[Coach Stollings] feels there is some distance between the coaching staff and our mental health staff that prohibits them from working more in sync. She and her staff that we met with all feel that they are conveying the importance and being a proponent of mental health and this is nothing new to athletic programs."

   b.    "[Coach Stollings] feels if she were given more information about student-athletes seeking help, essentially information pertaining to performance she could help the S/A get where they need to be."

   c.    "[Coach Stollings] contributed that all practices are videotaped and held for 5 years should they need to be reviewed at any time."

145.    The First Internal Review also found that while there "is miscommunication or misunderstanding with the coaching staff and the sports psychology department…[a] common theme from those interviewed is that the culture of this program has changed since last season for the better.  Specifically, comments from student-athletes on mental health. and to [Texas Tech] auxiliary staff seem to be a lot better from 2018-19."

146.    The First Internal Review concluded by finding that: "[T]here does not seem to be any consistent information that would indicate that student-athletes left the program for reasons other than having different goals than those of the (new) coaching staff."

VII.    **Coach Stollings Reports Sexual Harassment Allegations To Texas Tech, Resulting In A Second Review And Retaliation Against Coach Stollings**

147.    When Coach Stollings arrived at Texas Tech, she inherited the athletic trainer and other staff members.

148.    As Coach Stollings soon became aware, the Texas Tech Athletic Department, and Mr. Hocutt in particular, was unwilling to help her build a more effective and appropriate support staff.

149.    Head coaches of major athletic programs do not operate by themselves.  Instead, they lead a group of qualified assistant coaches, staff members, and trainers whose role is to provide additional or specialized support to the team.

150.    While Texas Tech employs the coaching staff, members of the coaching staff are required to follow the head coach's instructions and strategy.  These positions are important, as collaboration within the coaching staff is required to ensure the success of the athletic program.

151.    If the head coach determines that a member of the coaching staff is unable to perform his or her function appropriately, the Texas Tech Athletic Department must help coordinate a replacement.

152.    When the head coach of the men's basketball program, or any major men's athletic program, wants to replace a member of their support staff or coaching staff, the Texas Tech Athletic Department complies. Women's athletic programs were expected quietly to accept the status quo. The Texas Tech Athletic Department, and Mr. Hocutt in particular, generally ignored or responded negatively to coaches of women's athletic teams', including Coach Stollings', requests for more resources and attempts to improve their support staffs.

153.    By way of example, shortly after her employment commenced at Texas Tech, Coach Stollings discovered that a newly-hired athletic trainer was not able to perform her duties at a satisfactory standard.

154.    Coach Stollings requested that Mr. Hocutt replace the athletic trainer.  Mr. Hocutt, without explanation or adequate reasoning, refused the request.

155.    In contrast, Texas Tech, and Mr. Hocutt in particular, worked diligently to provide the best possible coaching staff for men's athletic programs.  While ignoring Coach Stollings' needs, the Texas Tech Athletic Department and, Mr. Hocutt in particular, funneled resources and support to men's athletic programs.

156.    If the head coach of a women's athletic program persisted, the Texas Tech Athletic Department, and Mr. Hocutt in particular, would retaliate against him or her.

157.    Texas Tech's men's basketball program currently lists the head coach plus 17 employees, including one associate head coach, two assistant coaches, one chief of staff, one strength and conditioning coach, one associate athletic trainer, one strength and conditioning assistant, one video coordinator, one academic advisor, one advisor to the head coach, one executive associate, one manager of sport operations, and five graduate managers.

158.    In contrast, Texas Tech's women's basketball program currently lists just 12 employees in addition to the head coach, including one associate head coach, one assistant coach and recruiting coordinator, one assistant coach, one chief of staff, one director of operations, one strength and condition coach, one athletic trainer, one graduate assistant/video coordinator, three graduate assistants, and one director of sports nutrition, which was shared among multiple athletic programs.

159.     This unofficial policy of minimizing and compromising the potential of women's sports resulted in severe harm to members of the Lady Raiders.

160.     By way of another example, Ralph Petrella ("Mr. Petrella") was employed by Texas Tech as the strength and conditioning coach for the women's basketball team.

161.     Mr. Petrella reported directly to Tory Stephens ("Mr. Stephens") and did not report to the head women's basketball coach.  The former Senior Associate Athletics Director/Senior Woman Administrator for the Department of Intercollegiate Athletics Judi Henry ("Ms. Henry") supervised Mr. Stephens.  At all relevant times, Ms. Henry held that position.

162.     On or about March 25, 2020, Coach Stollings was contacted by a student-athlete who wanted to discuss certain incidents involving Mr. Petrella.

163.     On this phone call, the student-athlete described situations where Mr. Petrella had acted inappropriately and asked for Coach Stollings' help.

164.     Coach Stollings was disturbed by these statements.  Coach Stollings knew that her duty was to protect her student-athletes.

165.     As Coach Stollings soon learned, Mr. Hocutt and other Texas Tech representatives had ignored reports of Mr. Petrella's inappropriate conduct.

166.     Mr. Hocutt's own inaction about reports concerning Mr. Petrella threatened to cast Mr. Hocutt in a bad light.  Another example of inappropriate conduct within the Athletic Department would cast yet a greater shadow over Mr. Hocutt's professional standing.  Because of that concern, Mr. Hocutt had chosen to ignore or otherwise hide the allegations of abuse.

167.     Coach Stollings immediately contacted the appropriate Texas Tech officials about these allegations.

168.    As a result of Coach Stollings' action, a Title IX complaint was filed against Mr. Petrella.  Coach Stollings committed the Lady Raiders and the coaching staff to full cooperation with the Title IX investigation.

169.    Mr. Petrella resigned before the investigation was completed.

170.    As a result of these events, the Texas Tech Athletic Department undertook a second internal review of the Lady Raiders ("The Second Internal Review").

171.    The allegations about Mr. Petrella were revealed, in large part or exclusively, because of Coach Stollings' actions.

172.    The Second Internal Review was conducted during the spring and summer of 2020.

173.    The Second Internal Review involved extensive interviews with multiple people and focused not only on the Title IX complaint but again evaluated the student-athletes' feedback that had been the subject of the First Internal Review.

174.    The Second Internal Review was completed in late June or early July 2020.

175.    The Second Internal Review confirmed that Coach Stollings acted in the best interests of the Lady Raiders, and that Coach Stollings had helped to report the Title IX claim regarding Mr. Petrella and cooperated with the Title IX investigation.

176.    On July 6, 2020, following completion of the Second Internal Review, Coach Stollings met with Mr. Hocutt.  At this meeting, Mr. Hocutt confirmed that the Second Internal Review had been completed and that all issues had been addressed.

177.    Mr. Hocutt specifically informed Coach Stollings that there were no findings adverse to Coach Stollings.  Among other statements of support, Mr. Hocutt told Coach Stollings that the Second Internal Review, like the First Internal Review, found "no red flags, not even yellow flags" concerning Coach Stollings.

178.    With the two internal investigations completed and Coach Stollings having been fully exonerated of any suggestion that she had acted inconsistently with her duties and responsibilities, Mr. Hocutt authorized Coach Stollings to hire an assistant coach already identified and proceed with other plans, including other hirings, for the upcoming season.

179.    Mr. Hocutt also asked Coach Stollings to agree to three action items in order to alleviate any public scrutiny of the program:

      a.    Mr. Hocutt asked if Coach Stollings would consider taking a one-year moratorium from using the sports performance monitoring system that some of the transferring student-athletes had criticized, and Coach Stollings, despite having used the system for years with enthusiastic feedback from prior teams, agreed not to use the system for one year;

      b.    Mr. Hocutt informed Coach Stollings that some of the players had complained about the "communication style" of a particular assistant coach, and Coach Stollings said she would talk with the staff member and keep a careful watch over that person's communications with student-athletes; and

      c.    Mr. Hocutt stated that the team expressed a desire to get to know Coach Stollings better, and Coach Stollings said she would make a special effort to be more available for some idle time with the athletes.

180.    Throughout the process, Mr. Hocutt had attempted to conceal a critical fact: Mr. Hocutt had been aware of the allegations about Mr. Petrella and had not acted upon them as required.

181.    The Texas Tech Athletic Department did not act until the student-athletes contacted Coach Stollings, who forced the issue.

27

182.    Upon information and belief, Mr. Hocutt resented and blamed Coach Stollings for making him appear tolerant of such abuse of student-athletes and inappropriate behavior within the Athletics Department.

183.    Coach Stollings' actions presented a problem for Mr. Hocutt.  Coach Stollings, by reporting the Title IX issue regarding Mr. Petrella and fully participating in the Title IX investigation, threatened to embarrass Mr. Hocutt, the job he was doing, and his priorities in running the Texas Tech Athletic Department.

184.    Mr. Hocutt already had been receiving criticism over his management of the Texas Tech Athletic Department and was afraid that a sexual harassment scandal would further damage his reputation.

185.    Mr. Hocutt would soon retaliate against Coach Stollings.

**VIII.    USA Today Publishes A Misleading Article About The Women's Basketball Team And Mr. Hocutt Orchestrates The Termination Of Coach Stollings To Protect Himself**

186.    On August 3, 2020, a USA Today reporter contacted Coach Stollings for a comment on an upcoming article regarding the Lady Raiders.

187.    Mr. Hocutt told Coach Stollings that Texas Tech's public relations firm would help craft a response to any inquiries.  Texas Tech approved a public release from Coach Stollings that included the following: "Our administration and my staff believe in the way we are building and turning around this program here."

188.    On August 4, 2020, Mr. Hocutt telephoned Coach Stollings and reinforced his support for her, emphasizing that the results of the exhaustive internal reviews had fully found that Coach Stollings had acted correctly.

189.    The USA Today article was published on August 5, 2020 (the "Article").

190.    The Article contained numerous complaints about the Lady Raiders, almost entirely from transferring student-athletes and largely reiterating the reasons for transfer provided on the NCAA waiver portal and which the internal reviews had addressed.

191.    Mr. Hocutt contacted Coach Stollings immediately after publication and again expressed his full support.

192.    Mr. Hocutt told Coach Stollings that the Article simply repeated complaints that the internal investigations had thoroughly vetted, and, since there was "no smoking gun," Coach Stollings should remain positive.

193.    However, Mr. Hocutt became concerned that, due to public perceptions and his own already-poor record, he was in danger of losing his job.

194.    Mr. Hocutt had long championed a culture of silence for athletic programs, only punishing infractions when they became public, and only as necessary in order to maintain appearances.  In fact, Mr. Hocutt regularly condoned or ignored issues, and especially issues involving men's athletic programs or concerning actions taken by men's coaches.

195.    Mr. Hocutt was susceptible to significant scrutiny as a result of other allegations that he undertook to cover for and hide, including multiple instances of disciplinary violations, unlawful substance use and other law enforcement issues, as well as for having forcefully advocated for student-athletes to avoid discipline such as suspensions and missing athletic competitions for various offenses.

196.    Mr. Hocutt was determined to distract from his own failings and to obscure his lack of action in the face of activities inconsistent with the supposed obligations and values of Texas Tech while at the same time finding an avenue to retaliate against Coach Stollings for having brought to light at least some of his failings.

197.    Mr. Hocutt set out to discredit and ultimately terminate Coach Stollings.  Mr. Hocutt was not operating on behalf of Texas Tech or the Texas Tech Athletic Department, but in the service of his own personal interests, when he set out on this course of action.  Mr. Hocutt intended to use his position at Texas Tech to aggrandize himself.  These public issues threatened his own position and goals, so Mr. Hocutt decided to act solely for his own behalf.

198.    Mr. Hocutt acted in his individual capacity and for what he perceived to be his own best interests, using the Article as a pretext to terminate Coach Stollings for having caused him public embarrassment by reporting a Title IX claim, participating in the Title IX investigation, and acting independently and with integrity during her tenure.

199.    Mr. Hocutt in essence had determined that, given particular activities and conduct that had occurred under his watch at Texas Tech, he had to sacrifice Coach Stollings' employment in order to attempt to protect his own position.

200.    Mr. Hocutt decided to use the article as a pretext to retaliate against Coach Stollings, and to rid himself of a head coach who acted with integrity, professionalism, and contrary to Mr. Hocutt's agenda.

201.    On August 6, 2020, Mr. Hocutt met with Coach Stollings and gave her the option of resigning or being fired.

202.    Coach Stollings refused to resign.

203.    In response, Mr. Hocutt sent a letter to Coach Stollings stating that "after consulting with me, President Schovanec has determined that your actions and the situation…qualify as Objectionable Behavior according to Section IV of your employment agreement. Additionally, President Schovanec has determined that this Objectionable Behavior cannot be cured."

204.    The letter concluded by stating that Coach Stollings was being terminated for cause pursuant to Section V of the Agreement.

205.    Mr. Hocutt followed the termination with various statements both internally at Texas Tech and to the media and public that wrongfully and maliciously attacked Coach Stollings, criticizing her professional standing and integrity, and otherwise defamed her.

206.    By way of example, on August 7, 2020, Mr. Hocutt held a press conference to discuss the termination of Coach Stollings.  At the press conference, Mr. Hocutt, with malice or reckless disregard for the truth:

    a.   Stated that Coach Stollings' contract was terminated with cause "based upon objectionable behavior."  Mr. Hocutt knew that Coach Stollings had not engaged in "objectionable behavior," that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student-athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

    b.   Stated that Coach Stollings had "failed" the Lady Raiders by not providing the coaching necessary for them to succeed.  Mr. Hocutt knew that the Lady Raiders were performing under Coach Stollings better than they had in nearly two decades, both academically and on the court, that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student-athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

    c.   Stated that Coach Stollings had not provided a "healthy environment of wellbeing" for the Lady Raider. Mr. Hocutt knew that Coach Stollings had not acted inappropriately or abusively, that this statement directly contradicted the findings

31

of the internal reviews and that almost the entire remaining student-athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

d.  Stated that Coach Stollings had failed to establish "relationships and trust" with the Lady Raiders," and that Coach Stollings' "level of leadership" was deficient.  Mr. Hocutt knew that Coach Stollings had in fact established relationships and trust with the core of the Lady Raiders, that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student-athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

e.  Stated that Coach Stollings had "let these girls down."  Mr. Hocutt knew that Coach Stollings had worked tirelessly to support the Lady Raiders and help them succeed, that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student-athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

f.  Made comments suggesting that Coach Stollings was connected to the Title IX complaint involving the strength and conditioning coach.  Mr. Hocutt knew that Coach Stollings was not responsible for supervising the strength and conditioning coach and had nothing to do with the allegations involving him, that this statement directly contradicted the findings of the internal reviews and that the student-athletes on the Lady Raiders involved with the allegations relating to the strength and conditioning coach contradicted Mr. Hocutt's malicious, reckless and false statement.

g.   Made comments suggesting that Coach Stollings lacked "high character and integrity."  Mr. Hocutt knew that Coach Stollings had not acted wrongfully, that this statement directly contradicted the findings of the internal reviews and that almost the entire remaining student-athletes on the Lady Raiders contradicted Mr. Hocutt's malicious, reckless and false statement.

207.    These statements, as well as others, are malicious, reckless, and false and have damaged Coach Stollings' personal and professional reputation.

208.    Mr. Hocutt's actions were not designed to benefit the Lady Raiders or Texas Tech.

209.    The misrepresentations and falsities Mr. Hocutt uttered to the public were designed solely to give himself cover, rid himself of a coach who acted independently and with integrity, and in an attempt to discredit Coach Stollings in the event she attempted to expose Mr. Hocutt for: covering up and ignoring actions and violative behavior in the Athletics Department that should have resulted in disciplinary action; the lies he told in contract negotiations with Coach Stollings and her representatives; his cover-up of the activities of the strength and conditioning coach; and, the fact that he punished and discriminated against female coaches for activities that he tolerated and in fact encouraged by male coaches and otherwise failed to support and otherwise provide resources to women's activities according to the standards mandated by law.

## COUNT I

### Breach of Contract

210.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

211.    Coach Stollings and Texas Tech were parties to a valid employment contract, the Agreement.  Under the terms of the Agreement, Texas Tech agreed to employ Coach Stollings until March 31, 2024, unless terminated for cause.

33

212.    At all relevant times, Coach Stollings performed all duties and requirements under the Agreement and was not in violation of any provision of the Agreement.

213.    On August 6, 2020, Defendants terminated Coach Stollings without having justifiable cause.

214.    By terminating the Agreement prior to March 31, 2024, Defendants materially breached the Agreement.

215.    By terminating the Agreement for cause, Defendants materially breached the Agreement.

216.    Defendants actions alleged above have directly and proximately caused, and continue to cause, Coach Stollings to suffer economic damages.

## COUNT II
### Fraud

217.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

218.    Mr. Hocutt and other Texas Tech officials and representatives made multiple representations to Coach Stollings during the course of Coach Stollings negotiating the Agreement, while deciding whether to join Texas Tech and during her employment.  These representations included, but were not limited to, promises and representations that Texas Tech would abide by the terms of the Agreement and the duties and obligations of Texas Tech set forth in the Agreement.

219.    If public reports are correct that Defendants intend to attempt to invoke the doctrine of sovereign immunity and otherwise abrogate and disclaim their duties and obligations set forth

34

in the Agreement, Mr. Hocutt and the other Texas Tech officials and representatives knew these statement were false.

220.    Mr. Hocutt and the other Texas Tech officials and representatives made these representations to induce Coach Stollings to become the head coach of the Lady Raiders.

221.    In reliance on these and other representations by Mr. Hocutt and the other Texas Tech officials and representatives, Coach Stollings entered into the Agreement.

222.    Without these representations, Coach Stollings would not have entered into the Agreement.

223.    Coach Stollings has been harmed by relying upon Mr. Hocutt's and other Texas Tech's officials and representatives' fraudulent representations.

<u>**COUNT III**</u>

**Fraud**

224.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

225.    Mr. Hocutt and other Texas Tech officials and representatives made multiple representations to Coach Stollings during the course of Coach Stollings negotiating the Agreement, while deciding whether to join Texas Tech and during her employment.  These representations included, but were not limited to, claims that Coach Stollings and the Lady Raiders would receive support at a standard that would allow the Lady Raiders to compete according to standards and at a level equivalent to the men's basketball team and its coach.

226.    Mr. Hocutt and the other Texas Tech officials and representatives knew these statements were false, and Coach Stollings and the Lady Raiders have not been treated in a manner that allowed them to perform at a level equivalent to the men's basketball program and do not and

have never received treatment and support equivalent to the men's basketball program and its coach.

227.    Mr. Hocutt and the other Texas Tech officials and representatives made these representations to induce Coach Stollings to become the head coach of the Lady Raiders.

228.    In reliance on these and other representations by Mr. Hocutt and the Texas Tech officials and representatives, Coach Stollings entered into the Agreement.

229.    Without these representations, Coach Stollings would not have entered into the Agreement.

230.    Coach Stollings has been harmed by relying upon Mr. Hocutt's and the other Texas Tech officials and representatives' representations.

## COUNT IV

### Fraudulent Inducement

231.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

232.    Mr. Hocutt and other Texas Tech officials and representatives made multiple representations to Coach Stollings to induce Coach Stollings to enter into the Agreement.  These representations include, but are not limited to, representations concerning the grounds under which Texas Tech could or would terminate the Agreement.

233.    Mr. Hocutt and other Texas Tech officials and representatives represented and otherwise promised that Texas Tech would abide by their duties and obligations set forth in the Agreement, including that Texas Tech would not terminate the Agreement unless Coach Stollings breached the Agreement and that Coach Stollings could and would have the protections in the Agreement to protect and enforce her rights and interests set forth in the Agreement.

234.     Mr. Hocutt and other Texas Tech officials and representatives represented and otherwise promised that Coach Stollings and the Lady Raiders would receive treatment that would allow the Lady Raiders to perform at a level equivalent to the men's basketball team and its coach.

235.     Mr. Hocutt and the other Texas Tech officials and representatives knew that these statements were false or made the representations recklessly and without any knowledge of their truth.

236.     Mr. Hocutt and the other Texas Tech officials and representatives made these representations with the intent that Coach Stollings would rely upon them and execute the Agreement.

237.     In reliance upon Mr. Hocutt's and the other Texas Tech officials and representatives' statements, Coach Stollings entered into the Agreement.

238.     Coach Stollings has been harmed by relying upon Mr. Hocutt's and the other Texas Tech officials and representatives' representations.

## COUNT V

### Defamation

### (Against Defendant Hocutt In His Individual Capacity)

239.     Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

240.     Mr. Hocutt is a non-media defendant.

241.     Following the termination of Coach Stollings, Mr. Hocutt made multiple malicious, knowingly reckless and false statements concerning Coach Stollings in her personal and professional capacity.  Mr. Hocutt made such reckless and false statements acting in his individual capacity and contrary to the best interests of Texas Tech.

242.    These statements were malicious, made in reckless disregard of the truth and knowingly false in their particular details, in their central points, and in the context in which they were made.

243.    Mr. Hocutt acted maliciously in order to preserve his own position by making these statements in order to deflect blame onto Coach Stollings and in an attempt to discredit Coach Stollings in the event she attempted to expose Mr. Hocutt for: covering up and ignoring actions and violative behavior in the Athletics Department that should have resulted in disciplinary action; the lies he told in contract negotiations with Coach Stollings; his cover-up of the activities of the strength and conditioning coach; and, the fact that he punished and discriminated against female coaches for activities that he tolerated and in fact encouraged by male coaches and otherwise failed to support and otherwise provide resources to women's activities according to the standards mandated by law.

244.    In making multiple malicious, knowingly reckless and false statements concerning Coach Stollings in her personal and professional capacity, Mr. Hocutt was acting outside the scope of his duties and responsibilities for Texas Tech and in his own interests and contrary to the interests of Texas Tech.

245.    Mr. Hocutt knew or should have known that the defamatory statements were malicious, were made with reckless disregard and were knowingly false.

246.    Mr. Hocutt's actions described above have directly and proximately caused, and continue to cause, Coach Stollings to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

247.    Coach Stollings has been harmed as a result of Defendants' conduct alleged herein.

38

## COUNT VI

### Defamation Per Se

### (Against Defendant Hocutt In His Individual Capacity)

248.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

249.    Following the termination of Coach Stollings, Mr. Hocutt made multiple malicious, reckless and knowingly false statements concerning Coach Stollings in her personal and professional capacity.  Mr. Hocutt made such reckless and false statements acting in his individual capacity and contrary to the best interests of Texas Tech.

250.    These statements were defamatory per se because they injured Coach Stollings' personal and professional reputation, have exposed Coach Stollings to public hatred, contempt, ridicule and financial injury, and impeach Coach Stollings' honesty, integrity, virtue and reputation.

251.    Mr. Hocutt's statements directly and indirectly claim that Coach Stollings acted with moral turpitude which breached the Agreement and necessitated her termination.

252.    In making multiple malicious, knowingly reckless and false statements concerning Coach Stollings in her personal and professional capacity, Mr. Hocutt was acting outside the scope of his duties and responsibilities for Texas Tech and in his own interests and contrary to the interests of Texas Tech.

253.    Mr. Hocutt's actions described above have directly and proximately caused, and continue to cause, Coach Stollings to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

254.    Coach Stollings has been harmed as a result of Defendants' conduct alleged herein.

## COUNT VII

**Sex Discrimination and Retaliation on the Basis of Coach Stollings' Sex in Violation of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e et seq.[1]**

255.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

256.    Plaintiff is an "employee" as that term is defined at 42 U.S.C. § 2000e(f).

257.    Defendant is an "employer" as that term is defined at 42 U.S.C. § 2000e(b).

258.    Title VII prohibits discrimination based on sex in employment.

259.    As alleged, by engaging in the above-described acts, practices, and omissions, Defendant engaged in unlawful discrimination under Title VII based on Plaintiff's sex and sexual orientation.

260.    This discriminatory conduct took the form of lower pay, worse treatment, a hostile environment, disparate treatment, and, ultimately, unjustifiable termination of Coach Stollings' contract.

261.    Defendants knew that Coach Stollings is a member of a protected class, *i.e.*, both a woman and a lesbian.

262.    Defendants' illegal actions against Coach Stollings were aimed at Plaintiff because of her sex and because of her orientation, resulting in adverse impacts to the terms and conditions of Coach Stollings' employment.

263.    Defendants treated similarly situated coaches who were male and/or heterosexual more favorably.

264.    Defendants were aware of this conduct, yet took no remedial action.

---

[1] On January 13, 2021, Coach Stollings received a Notice of Right to Sue from the United States Equal Employment Opportunity Commission ("EEOC") and amends this Complaint to add counts for sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.

265.     As such, Defendants violated 42 U.S.C. § 2000e-2(a) and discriminated against Coach Stollings by subjecting Coach Stollings to less favorable terms and conditions of employment and by imposing heightened and/or disproportionate requirements on Coach Stollings, and ultimately terminating Coach Stollings' employment.

266.     The reasons that Defendants put forth for terminating Coach Stollings' contract are false and a pretext for unlawful discrimination.

267.     After Coach Stollings was terminated, Defendants replaced the position with a heterosexual coach.

268.     Defendants' actions constitute violations of Title VII and its implementing regulations.

269.     Defendants' actions described above directly and proximately caused, and continue to cause, Coach Stollings to suffer loss of income and other financial benefits, loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment, and damage to her professional reputation.

## COUNT VIII

**Sex Discrimination on the Basis of Coach Stollings' Sex and Retaliation in Violation of the Education Amendments Act of 1972 (Title IX), 20 U.S.C. §§ 1681, *et seq.***

270.     Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

271.     Title IX and its implementing regulations prohibit a recipient of federal funding from discriminating against an employee in education-related employment on the basis of sex, including in rates of pay or any other form of compensation and changes in compensation, job assignments, fringe benefits available by virtue of employment, employer-sponsored activities,

41

including those that are social and recreational, termination, and any other term, condition or privilege of employment.  34 C.F.R. §106.51.

272.   At all times relevant to this Complaint, Texas Tech was an employer and a recipient of federal funding within the meaning of Title IX and its implementing regulations.

273.   At all times relevant to this Complaint, Coach Stollings was an education-related employee of a recipient of federal funding within the meaning of Title IX and its implementing regulations.

274.   Defendants discriminated against Coach Stollings because of her sex (female) by subjecting her to disparate treatment as compared to similarly situated male coaches, including but not limited to coaches of male sports teams, and terminating her employment because of sex.

275.   Defendants also discriminated against Coach Stollings – and others – because she was a member of the gay and lesbian community employed by Texas Tech in the Athletics Department.

276.   Coach Stollings participated in the filing of a Title IX complaint and the resulting Title IX investigation involving the Texas Tech strength and conditioning coach.

277.   Defendants retaliated against Coach Stollings for reporting the Title IX claim and participating in the Title IX investigation.

278.   Title IX complaints and investigations are considered protected activities, and it is a violation of Title IX to take adverse actions against an employee who is engaging in a protected activity.

279.   Defendants were aware of Coach Stollings' protected activity.

280.   Defendants took adverse action against Coach Stollings including, but not limited to, terminating Coach Stollings' contract for pretextual reasons.

281.    Defendants' actions were causally connected to Coach Stollings' protected activities.

282.    Defendants' actions constitute violations of Title IX and its implementing regulations.

283.    Defendants' actions described above directly and proximately caused, and continue to cause, Coach Stollings to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

## COUNT IX

### Violation Of Constitutional And Civil Rights Pursuant To 42 U.S.C. § 1983 And The Equal Protection Clause

284.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

285.    Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex.   This constitutional right is clearly established.

286.    Pursuant to 42 U.S.C. § 1983, parties acting under color of state law who violate an individual's constitutional rights can be held liable for damages.

287.    At all times relevant to this Complaint, Coach Stollings was an employee of a public institution, Texas Tech.

288.    Defendants, acting under color of state law, violated Coach Stollings' constitutional right to be free from sex discrimination in employment, including by directly participating and orchestrating the termination of her contract with Texas Tech for conduct and activities with regard

43

to the women's basketball program that, even if accurately described by Defendants, Defendants not only have tolerated but endorsed for men's sports teams and thereby adversely affected the terms and conditions of Coach Stollings' employment and subjected her to disparate treatment and disparate discipline and in retaliation for Coach Stollings insisting upon support for the women's basketball program that would have allowed the Lady Raiders to operate the women's basketball team in a manner equivalent to men's sports teams, including the men's basketball team.

289.    Defendants, acting under the color of state law, violated Coach Stollings' constitutional right to be free from sex discrimination in employment by subjecting her to disparate treatment and disparate discipline as alleged above.

290.    Defendants violated Coach Stollings' constitutional right to be free from sex discrimination in employment by terminating her employment because she was a member of the gay and lesbian community employed in the Athletics Department.

291.    As a direct result of the actions, statements and/or policies of Texas Tech, Mr. Hocutt and Texas Tech officials and representatives, Coach Stollings has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

292.    Defendants acted intentionally and with callous disregard for Coach Stollings' known statutory and constitutional rights.

293.    Defendants' conduct alleged above has directly and proximately caused, and continues to cause, Coach Stollings to suffer loss of income and other financial benefits, loss of future professional opportunities and future income, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

## COUNT X

### Specific Performance

294.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

295.    Coach Stollings and Texas Tech were parties to a valid employment contract, the Agreement.  Under the terms of the Agreement, Texas Tech agreed to employ Coach Stollings until March 31, 2024, unless terminated for cause.

296.    At all relevant times, Coach Stollings performed all duties and requirements under the Agreement and was not in violation of any provision of the Agreement.

297.    On August 6, 2020, Defendants terminated Coach Stollings without having justifiable cause.

298.    By terminating the Agreement prior to March 31, 2024, Defendants materially breached the Agreement.

299.    By terminating the Agreement for cause, Defendants materially breached the Agreement.

300.    Defendants actions alleged above have directly and proximately caused, and continue to cause, Coach Stollings to suffer economic damages.

301.    Monetary damages are an inadequate remedy. Therefore, specific performance is a necessary remedy.

## COUNT XI

### Tortious Interference With Contract

#### (Against Defendant Hocutt In His Individual Capacity)

302.    Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

303.     Coach Stollings and Texas Tech were parties to a valid employment contract, the Agreement.  Under the terms of the Agreement, Texas Tech agreed to employ Coach Stollings until March 31, 2024, unless terminated for cause.

304.     Defendant Hocutt committed a willful and intentional act of interference with the Agreement.

305.     Defendant Hocutt was not acting in good faith or on Texas Tech's behalf. Defendant Hocutt was motivated solely by his own personal interest.

306.     Defendant Hocutt's actions were neither privileged nor justified under the terms of the Agreement or his employment with Texas Tech.

307.     Defendant Hocutt's actions caused Texas Tech to breach the Agreement.

308.     Defendant Hocutt's actions alleged above have directly and proximately caused, and continue to cause, Coach Stollings to suffer economic damages.

## COUNT XII

### Declaratory Judgment

309.     Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

310.     The Agreement between Coach Stollings and Texas Tech provided that Coach Stollings could not be terminated prior to the expiration of the term of the Agreement unless there was cause.

311.     Texas Tech's own internal reviews found that no cause for termination existed, as Coach Stollings had acted properly and within the boundaries of the Agreement at all times.

312.     At the same time, Texas Tech continues to hire and retain male coaches and, specifically, coaches of men's sports teams who engage in far more aggressive behavior towards student-athletes, including abuse.

46

313.    Coach Stollings requests the Court to issue a declaratory judgment finding that she was not in breach of the Agreement and that Texas Tech terminated the Agreement without cause.

314.    Following the termination of Coach Stollings, Mr. Hocutt made multiple malicious, knowingly reckless and false statements concerning Coach Stollings in her personal and professional capacity.

315.    Coach Stollings requests the Court to issue a declaratory judgment finding that these statements were malicious, made in reckless disregard of the truth and knowingly false in their particular details, in their central points and in the context which they were made.

316.    Coach Stollings requests the Court to issue a declaratory judgment finding that these statements have exposed Coach Stollings to public hatred, contempt, ridicule and financial injury, and impeach Coach Stollings' honesty, integrity, virtue and reputation.

317.    Coach Stollings has no other adequate remedy at law.

## COUNT XIII

### Violation Of Constitutional And Civil Rights Pursuant To 42 U.S.C. § 1983 And The Equal Protection Clause

### (Against Defendant Hocutt In His Official Capacity)

318.     Plaintiff repeats and realleges the allegations contained in each of the foregoing Paragraphs as if fully set forth herein.

319.     Under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, employees of public institutions have the right to be free from unlawful employment discrimination on the basis of their sex.   This constitutional right is clearly established.

320.     At all times relevant to this Complaint, Coach Stollings was an employee of a public institution, Texas Tech.

321.     Defendant Hocutt, acting in his official capacity, violated Coach Stollings' constitutional right to be free from sex discrimination in employment, including by directly participating in and orchestrating the termination of her contract with Texas Tech for conduct and activities with regard to the women's basketball program that Defendant Hocutt not only has tolerated but endorsed for men's sports teams and thereby adversely affected the terms and conditions of Coach Stollings' employment and subjected her to disparate treatment and disparate discipline and in retaliation for Coach Stollings insisting upon support for the women's basketball program that would have allowed the Lady Raiders to operate the women's basketball team in a manner equivalent to men's sports teams, including the men's basketball team.

322.     Defendant Hocutt, acting in his official capacity, violated Coach Stollings' constitutional right to be free from sex discrimination in employment by subjecting her to disparate treatment and disparate discipline as alleged above.

48

323.     Defendant Hocutt, acting in his official capacity, violated Coach Stollings' constitutional right to be free from sex discrimination in employment by effectuating the termination of her employment because she was a member of the gay and lesbian community employed in the Athletics Department.

324.     Defendant Hocutt, acting in his official capacity, violated and otherwise attempted to make permanent the violation of Coach Stollings' constitutional right to be free from sex discrimination in employment by, following the termination of Coach Stollings, making multiple malicious, knowingly reckless and false statements  and statements that were defamatory and defamatory per se concerning Coach Stollings in her personal and professional capacity.

325.     These statements were malicious, made in reckless disregard of the truth and knowingly false in their particular details, in their central points, and in the context in which they were made and were defamatory per se.

326.     Mr. Hocutt acted maliciously in order to preserve his own position by making these statements in order to deflect blame onto Coach Stollings and in an attempt to discredit Coach Stollings in the event she attempted to expose Mr. Hocutt for: covering up and ignoring actions and violative behavior in the Athletics Department that should have resulted in disciplinary action; the lies he told in contract negotiations with Coach Stollings; his cover-up of the activities of the strength and conditioning coach; and, the fact that he punished and discriminated against female coaches for activities that he tolerated and in fact encouraged by male coaches and otherwise failed to support and otherwise provide resources to women's activities according to the standards mandated by law.

327.     In making multiple malicious, knowingly reckless and false statements, and statements that were defamatory per se concerning Coach Stollings in her personal and

49

professional capacity, Mr. Hocutt knew or should have known that the defamatory statements were malicious, were made with reckless disregard and were knowingly false.

328.    Mr. Hocutt's actions described above have directly and proximately caused, and continue to cause, Coach Stollings to suffer a loss of future professional opportunities, pain and suffering, humiliation, personal embarrassment and damage to her professional reputation.

329.    Coach Stollings has been harmed as a result of Defendant Hocutt's conduct alleged herein.

330.    As a direct result of Defendant Hocutt's actions, defamatory and defamatory per se statements alleged above, Coach Stollings has suffered an unconstitutional deprivation of her rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.

331.    Defendant Hocutt, acting in his official capacity, acted intentionally and with callous disregard for Coach Stollings' known statutory and constitutional rights under 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution.


## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Marlene Stollings seek judgment in her favor and against Defendants as follows:

(i)    Awarding Coach Stollings compensatory damages, general damages, special damages, nominal damages, statutory damages and punitive damages in an amount to be proved at trial for breach of contract, fraud, fraudulent inducement, defamation (against Defendant Kirby Hocutt in his individual capacity), defamation per se (against Defendant Kirby Hocutt in his individual capacity), violations of Title VII, Title IX, 42 U.S.C. § 1983, and the Equal Protection Clause of the United

States Constitution, and tortious interference with contract (against Defendant Kirby Hocutt in his individual capacity);

(ii)     Specific performance of Coach Stollings' employment contract, including, but not limited, to the requirement that Defendants comply with the terms and conditions of Coach's Stollings' Agreement, including but not limited to the appropriate termination provisions (*i.e.*, a termination without cause);

(iii)    A declaratory judgment that Defendants breached the employment contract with Coach Stollings without cause;

(iv)    A declaratory judgment that Defendant Kirby Hocutt's statements were malicious, knowingly reckless and false;

(v)     A declaratory judgment that Defendant Kirby Hocutt's statements injured Coach Stollings' personal and professional reputation, have exposed Coach Stollings to public hatred, contempt, ridicule and financial injury, and impeach Coach Stollings' honesty, integrity, virtue and reputation;

(vi)    As against Defendant Hocutt in his official capacity as a result of his violation of Coach Stollings' rights pursuant to 42 U.S.C. § 1983, and the Equal Protection Clause of the United States Constitution, as alleged above, specific performance and other equitable relief, including injunctive relief, directing and requiring Defendant Hocutt, who is delegated with authority to make hiring and firing decisions in the Athletics Department, to act to the full extent of his authority and duty to retract or otherwise to rescind the decision to terminate Coach Stollings' Employment Agreement for cause;

(vii)    As against Defendant Hocutt in his official capacity as a result of his violation of Coach Stollings' rights pursuant to 42 U.S.C. § 1983, and the Equal Protection Clause of the United States Constitution, as alleged above, specific performance and other equitable relief, including injunctive relief, directing and requiring Defendant Hocutt to retract and otherwise correct the defamatory and defamatory per se statements alleged above impeaching or attempting to impeach Coach Stollings' honesty, integrity, virtue and reputation;

(viii)    Reasonable attorneys' fees;

(ix)    Costs; and

(x)    Such further relief as the Court deems just and proper.

Dated: September 15, 2021

MAYFIELD LAW FIRM, LLP

By:     /s/ Angelique Weaver
         Angelique Weaver
         Texas Bar No. 24008247
         1001 Main St., Suite 504
         Lubbock, TX 79401
         (806) 722-1616
         (806) 722-1614 (fax)
         aweaver@mayfield-lawfirm.com

         Tod Mayfield
         Texas Bar No. 00787985
         tmayfield@mayfield-lawfirm.com
         Joseph Parsons
         Texas Bar No. 24067815
         jparsons@mayfield-lawfirm.com
         320 S. Polk, Ste 400
         Amarillo, TX 79101
         (860) 242-0152

MOSKOWITZ AND BOOK, LLP

By:     /s/ Peter R. Ginsberg
         Peter R. Ginsberg (*pro hac vice*)
         345 Seventh Avenue, 21st Floor
         New York, New York 10001
         (212) 221-7999
         pginsberg@mb-llp.com

         *Attorneys for Plaintiff Marlene Stollings*